**NO. 23-1127**

𝕴𝖓 𝕿𝖍𝖊
# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝕺𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝕱𝖔𝖗 𝕿𝖍𝖊 𝕱𝖔𝖚𝖗𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## ASHLEY BUSH,

*Plaintiff - Appellant,*

**v.**

## FREDERICK COUNTY PUBLIC SCHOOLS,

*Defendant - Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE**
(Julie R. Rubin, District Judge)

————————

**RESPONSE BRIEF OF APPELLEE
FREDERICK COUNTY PUBLIC SCHOOLS**

————————

**Donald E. English, Jr.**
**JACKSON LEWIS PC**
**2800 Quarry Lake Drive**
**Suite 200**
**Baltimore, MD 21209**
**(410) 415-2007**
**donald.english@jacksonlewis.com**

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1127__    Caption: _Ashley Bush v. Frederick County Public Schools_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Frederick County Public Schools_
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                        ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☑YES ☐NO
    If yes, identify entity and nature of interest:
    Wright Risk Management Company is the insurance carrier for this matter.

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Donald E. English, Jr.                    Date:    February 16, 2023

Counsel for: Frederick County Public Schools

- 2 -

Print to PDF for Filing

## TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES................................................................iv

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES .....................................................................1

STATEMENT OF THE CASE.................................................................2

STATEMENT OF FACTS ......................................................................4

    A.    Bush Was A Temporary, At-Will Employee With Her
          Assignment Ending At The End of the 2019-2020 School Year...........4

    B.    FCPS Has Policies Prohibiting Discrimination And Retaliation ..........5

    C.    FCPS Took Appropriate Remedial Acts In Response To Alleged
          Incidents At The 2018 Linganore Game .................................................5

    D.    FCPS Addressed Its Legitimate Concerns About Both Bush's
          and Easterday's Behavior After The 2018 Linganore Game And
          Did Not Retaliate Against Bush For Reporting What Her
          Players Witnessed At The Game ..........................................................8

    E.    FCPS Appropriately Issued Bush A Letter Of Concern After
          Referee Complained About Bush's Behavior During A 2019
          Basketball Game And Bush Admits That The Letter Was Not
          Discriminatory. ...................................................................................10

    F.    FCPS Appropriately Suspended Bush With Pay For One Game
          After She Insubordinately Refused To Remove A Facebook
          Post Discrediting A Student-Athlete And Refused To Admit
          That She Made The Post ....................................................................11

    G.    FCPS Rightfully Investigated Bush After Five Of Her Varsity
          Players Quit The Team En Masse And Alleged Bush Was
          "Emotionally Abusive." .....................................................................16

i

H.    FCPS Terminated Bush's Employment After She Was Recorded Saying "F**k White People" To Student-Athletes In A Public Classroom. ........................................................................19

PROCEDURAL HISTORY ........................................................................22

SUMMARY OF THE ARGUMENT ...........................................................24

STANDARD OF REVIEW ........................................................................25

ARGUMENT ...............................................................................................26

A.    Bush is Time-Barred from Appealing the Order Granting FCPS' Motion to Strike Bush's Opposition to FCPS' Motion for Summary Judgment ...........................................................................26

B.    The District Court's Decision to Strike was an Appropriate Use of its Discretion ......................................................................29

1.    In Applying the Pioneer Factors, the District Court Properly Struck Bush's Opposition.............................................31

a.    Bush Has No Good Reason For The Delay ...................32

b.    Bush Did Not Act In Good Faith ...................................35

c.    The Length of Bush's Delay Caused Prejudice to FCPS ..............................................................................36

2.    Bush Failed to Preserve for Appeal Any Argument that the Factors Governing Default Judgments are Applicable to the Instant Case. .................................................................37

C.    The District Court's Order Granting FCPS's Motion for Summary Judgment Should Be Affirmed, Whether Or Not Bush's Opposition Is Considered. .....................................................43

1.    Bush's Discrimination Claims Under Title VII (Counts I & II) and MFEPA (Count VIII) Were Properly Dismissed. .........................................................................................44

a.    The District Court Properly Limited Bush's Title
      VII And MFEPA Claims To The Events
      Surrounding Her Termination In February 2020 ........... 44

      i.   The Opposition Raises No New Facts Or
           Arguments ................................................. 48

b.    Bush Failed to Provide any Evidence that FCPS's
      Reason for Termination (FWP Statement) was
      False. ....................................................................... 52

      i.   The Opposition Raises No New Facts Or
           Arguments ................................................. 55

2.    Hostile Work Environment (Count VII) ................................. 57

      a.    The Opposition Raises No New Facts Or
            Arguments ......................................................... 60

3.    Breach of Written Employment Agreement (Count III) ........... 61

      a.    The Opposition Raises No New Facts Or
            Arguments ......................................................... 65

4.    Wrongful Termination (Count IV) ......................................... 65

      a.    The Opposition Raises No New Facts Or
            Arguments ......................................................... 67

5.    Violation of Maryland's Wiretap Statute (Count V) ................ 67

      a.    The Opposition Raises No New Facts Or
            Arguments ......................................................... 68

6.    Defamation (Count VI) ........................................................ 70

      a.    The Opposition Raises No New Facts Or
            Arguments ......................................................... 71

CONCLUSION ..................................................................................... 73

RESPONSE TO REQUEST FOR ORAL ARGUMENT.......................................74

CERTIFICATE OF COMPLIANCE.........................................................................75

CERTIFICATE OF SERVICE ...............................................................................75

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adams v. Anne Arundel Cty. Pub. Schools*,
    789 F.3d 422 (4th Cir. 2015) ...........................................................50

*Adler v. American Standard Corp.*,
    291 Md. 31, 432 A.2d 464 (1981) ...................................................61

*AMTRAK. v. Morgan*,
    536 U.S. 101 (2002).......................................................45, 46, 48, 58

*B&G Bldg. Maint., Inc. v. NLRB*,
    123 F. App'x. 551 (4th Cir. Jan. 6, 2005) .......................................32

*Banks v. Bd. of Educ.*,
    2020 U.S. Dist. LEXIS 25368 (D. Md. Feb. 12, 2020)..................45

*Baqir v. Principi*,
    434 F.3d 733 (4th Cir. 2006) ...........................................................58

*Battle v. Burwell*,
    No. PWG-14-2250, 2016 U.S. Dist. LEXIS 127202
    (D. Md. Sept. 19, 2016) ...................................................................47

*Bender v. Suburban Hosp.*,
    134 Md. App. 7 (Md. Ct. Sp. App. 2000)................................62, 64

*Blakes v. City of Hyattsville*,
    909 F. Supp. 2d 431 (D. Md. 2012)................................................50

*Blount v. Dept. of Health and Human Services*,
    400 F. Supp. 2d 838 (D. Md. 2004)................................................47

*Bryan v. Lucent Techs., Inc.*,
    307 F. Supp. 2d 726 (D. Md. 2004)................................................51

*Byington v. NBRS Fin. Bank*,
    903 F. Supp. 2d 342 (D. Md. 2012)................................................45

*Cain v. Johnson*,
    293 F. App'x 216 (4th Cir. 2008) ...................................................29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..............................................................25, 43

*Chacko v. Patuxent Inst.*,
    429 F.3d 505 (4th Cir. 2005) ...........................................................45

*Chekey v. BTR Realty, Inc.*,
    575 F. Supp. 715 (D. Md. 1983).....................................................67

*Coleman v. Masonic Home of Va.*,
    No. 3:12-cv-682, 2013 U.S. Dist. LEXIS 6057
    (E.D. Va. Jan. 15, 2013) ...................................................46

*Conney v. Ameri-Klean Servs., Inc.*,
    No. RDB-17-3583, 2018 U.S. Dist. LEXIS 30081
    (D. Md. Feb. 26, 2018) ...................................................46

*Cook v. CSX Transp. Corp.*,
    988 F.2d 507 (4th Cir. 1993) ...........................................................53

*Crockett v. SRA Int'l*,
    943 F. Supp. 2d 565 (D. Md. 2013)...............................................47

*Curtis v. Evans*,
    No. 2003-2774, 2004 U.S. Dist. LEXIS 9611
    (D. Md. May 27, 2004)...................................................30

*Custer v. Pan Am. Life Ins. Co.*,
    12 F.3d 410 (4th Cir. 1993) ...........................................................40

*Dachman v. Shalala*,
    46 F.Supp.2d 419 (D. Md. 1999)...................................................46

*Dahl v. Brunswick Corp.*,
    277 Md. 471, 356 A.2d 221 (1976)...............................................62

*Diamond v. Colonial Life & Accident Ins. Co.*,
    416 F.3d 310 (4th Cir. 2005) ...........................................52, 53, 54

*EEOC v. R&R Ventures*,
    244 F.3d 334 (4th Cir. 2001) ........................................................48

*Feargrounds, LLC v. Old Time Contractors, Inc.*,
    Nos. WDQ-10-87 & WDQ-10-88, 2010 U.S. Dist. LEXIS
    42701 (D. Md. Apr. 30, 2010) ...............................................33, 34

*Felty v. Graves-Humphreys Co.*,
    818 F.2d 1126 (4th Cir. 1987) .....................................................26

*Fort Bend Cty. v. Davis*,
    139 S. Ct. 1843 (2019)..................................................................49

*Foster v. Tandy Corp.*,
    828 F.2d 1052 (4th Cir. 1987) ................................................ 28-29

*Fournier v. United States Fidelity & Guar. Co.*,
    82 Md. App. 31, *cert. denied*, 319 Md. 581 (1990) ................62, 63

*Gaskins v. Marshall Craft Assocs., Inc.*,
    110 Md. App. 705 (Md. Ct. Spec. App. 1996)............................66

*Gayle v. United Parcel Serv., Inc.*,
    401 F.3d 222 (4th Cir. 2005) .......................................................42

*Gillum v. Pilot Travel Centers, LLC*,
    No. WDQ-14-0173, 2015 U.S. Dist. LEXIS 80601
    (D. Md. June 22, 2015).................................................................30

*H & W Fresh Seafoods, Inc. v. Schulman*,
    200 F.R.D. 248 (D. Md. 2000) ....................................................30

*Hill v. Lockheed Martin Logistics Mgmt.*,
    354 F.3d 277 (4th Cir. 2004) .......................................................55

*Holland v. Big River Mins. Corp.*,
    181 F.3d 597 (4th Cir. 1999) .......................................................39

*Holland v. Wash. Homes, Inc.*,
    487 F.3d 208 (4th Cir. 2007) .................................................47, 54

*Hospital Del Maestro v. NLRB*,
    263 F.3d 173 (1st Cir. 2001) .......................................................................32

*Jackson v. Lightsey*,
    775 F.3d 170 (4th Cir. 2014) .....................................................................28

*James v. Verizon*,
    458 F. App'x 262 (4th Cir. 2011) ...............................................................27

*Janey v. N. Hess Sons, Inc.*,
    268 F. Supp. 2d 616 (D. Md. 2003) ...........................................................46

*Johnson v Railway Express Agency, Inc.*,
    421 U.S. 454 (1975) ....................................................................................72

*Jones v. Prince George's Cty*,
    355 F. App'x 724 (4th Cir. 2009) ...............................................................29

*Lauture v. St. Agnes Hosp.*,
    429 Fed. App'x 300 (4th Cir. 2011) ...........................................................25

*Lewis v. Hoke Cnty.*,
    No. 22-6171, 2022 U.S. App. LEXIS 14451 (4th Cir. 2022) ...........25, 31, 37

*Link v. Wabash R.R. Co.*,
    370 U.S. 626 (1962) ....................................................................................42

*Lowry v. McDonnell Douglas Corp.*,
    211 F.3d 457 (8th Cir. 2000) ................................................................33, 53

*MacGill v. Blue Cross of Md.*,
    77 Md. App. 613, 551 A.2d 501, *cert. denied*,
    315 Md. 692, 556 A.2d 673 (1989) ............................................................64

*Makovi v. Sherwin-Williams Co.*,
    316 Md. 603 (Md. 1989) .............................................................................66

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ....................................................................................52

*McNeal v. Montgomery County*,
   307 F. App'x. 766 (4th Cir. 2009)....................................................72

*Middlebrooks v. University of Maryland*,
   980 F. Supp. 824 (D. Md. 1997)....................................................54

*Miles v. Dell, Inc.*,
   429 F.3d 480 (4th Cir. 2005) ........................................................45

*Munive v. Fairfax Cnty. Sch. Bd.*,
   2017 U.S. Dist. LEXIS 25020 (D. Md. Feb. 21, 2017),
   *aff'd in relevant part*, 700 F. App'x. 288 (4th Cir. 2017) ............................47

*Muth v. United States*,
   1 F.3d 246 (4th Cir. 1993) ............................................................38

*Ocheltree v. Scollon Prods.*,
   335 F.3d 32 (4th Cir. 2003) ..........................................................58

*Panhorst v. U.S.*,
   241 F.3d 367 (4th Cir. 2001) ........................................................27

*Parks v. Alpharama, Inc.*,
   25 A.3d 200 (Md. 2011) ..............................................................66

*Payne v. Brake*,
   439 F.3d 198 (4th Cir. 2006) ..................................................38, 41

*Peters v. City of Mt. Rainier*,
   No. GJH-14-00955, 2014 U.S. Dist. LEXIS 137146
   (D. Md. Sep. 29, 2014) ..............................................................33

*Pioneer Inv. Servs. v. Brunswick Assocs.*,
   507 U.S. 380 (1993)..........................................................24, 31, 38

*Pulley v. KPMG Consulting, Inc.*,
   348 F. Supp.2d 388 (D. Md. 2004), aff'd,
   183 F. App'x. 387 (4th Cir. 2006)..................................................43

*Reeves v. Sanderson Plumbing Prods*,
   530 U.S. 133 (2000)....................................................................52

*Robinson v. Wix Filtration Co.*,
    599 F.3d 403 (4th Cir. 2010) .........................................................................34

*Rowe v. Marley Co.*,
    233 F.3d 825 (4 Cir. 2000) ............................................................................51

*Shapiro v. Massengill*,
    105 Md. App. 743, 661 A.2d 202 (1995) ......................................................63

*Silivanch v. Celebrity Cruises, Inc.*,
    333 F.3d 355 (2d Cir. 2003) .........................................................................33

*Singleton v. Wulff*,
    428 U.S. 106 (1976)......................................................................................38

*Sloop v. Memorial Mission Hosp., Inc.*,
    198 F.3d 147 (4th Cir. 1999) .......................................................................44

*St. Mary's Honor Center v. Hicks*,
    113 S. Ct. 2742 (1993)............................................................................ 52-53

*Sydnor v. Fairfax Cty.*,
    681 F.3d 591 (4th Cir. 2012) .......................................................................45

*Thompson v. E.I. DuPont de Nemours & Co., Inc.*,
    76 F.3d 530 (4th Cir. 1996) .........................................................................32

*United States v. Henry*,
    673 F.3d 285 (4th Cir. 2012) .................................................................24, 30

*United States v. James*,
    No. 20-7895, 2022 U.S. App. LEXIS 28219 (4th Cir. 2022) ......................27

*United States v. Medford*,
    661 F.3d 746 (4th Cir. 2011) .................................................................25, 31

*United States v. One 1971 Mercedes Benz 2-Door Coupe*,
    542 F.2d 912 (4th Cir. 1976) .......................................................................38

*United States v. Riley*,
    No. 20-7446, 2021 U.S. App. LEXIS 30543
    (4th Cir. Oct. 13, 2021)..............................................................39

*United States v. Weaver*,
    282 F.3d 302 (4th Cir. 2002) ..............................................24, 31

*White v. City of Annapolis*,
    No. JFM-13-1330, 2015 U.S. Dist. LEXIS 110771
    (D.Md. Aug 21, 2015), aff'd, 639 F. App'x. 209
    (4th Cir., May 12, 2016) ..........................................................58

**Statutes**

28 U.S.C. § 1291 ..........................................................................1

42 U.S.C. § 1981 ........................................................................72

42 U.S.C.A. § 2000e-2(m) .........................................................52

42 U.S.C. § 2000e-5(e) ..............................................................48

42 U.S.C. § 2000e-5(e)(1).....................................................45, 48

Civil Rights Act Title VII (1964)..........................................*passim*

Maryland Fair Employment Practices Act............................44, 65, 66, 67

Maryland Wiretap Act ..........................................................68, 69

Md. Code Ann., Cts. & Jud. Proc. § 5-105 ...............................70

Md. Code Ann., Cts. & Jud. Proc. § 10-401(2)(c)(7)(i) ............70

Md. Code Ann., Cts. & Jud. Proc. § 10-402(a) .........................70

Md. Code Ann., Cts. & Jud. Proc. § 10-410 .............................68

Md. Code Title VII and Art. 49B...............................................66

**Rules**

Fed. R. App. P. 4(a)(1)(A) ................................................................26

Fed. R. App. P. 4(a)(5)(A)(i) ...........................................................27

Fed. R. App. P. 30(b) .......................................................................33

Fed. R. Civ. P. 56 ...........................................................32, 34, 40, 43

Fed. R. Civ. P. 56(a) ........................................................................25

Fed. R. Civ. P. 56(b)(2009) ..............................................32, 37, 41

Fed. R. Civ. P. 59(e) .........................................................................39

Md. Dist. Ct. Local R. 105.2(a) .........................................23, 29, 30

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the District Court's January 12, 2023 Order granting Frederick County Public Schools' ("FCPS") Motion for Summary Judgment and dismissing Appellant, Ashley Bush's ("Bush") claims. However, this Court lacks jurisdiction over an appeal of the District Court's June 30, 2022 Order granting FCPS's Motion to Strike Bush's Opposition to FCPS's Motion for Summary Judgment because Bush's Notice of Appeal to this Court does not appeal the June 30, 2022 Order.

## STATEMENT OF ISSUES

1. Whether this Court has jurisdiction over Bush's appeal of the District Court Order that granted FCPS's Motion to Strike Bush's Opposition to FCPS's Motion for Summary Judgment.

2. Whether the District Court abused its discretion when it granted FCPS's Motion to Strike Bush's Opposition to FCPS's Motion for Summary Judgment.

3. Whether the District Court's Order granting FCPS's unopposed Motion for Summary Judgment should be affirmed.

4. Whether the District Court's Order granting FCPS's Motion for Summary Judgment should be affirmed even if Bush's Opposition to FCPS's Motion for Summary Judgment and FCPS' Reply are considered.

## **STATEMENT OF THE CASE**

Ashley Bush, a former head coach of the Fredrick High School ("FHS") girls' basketball team, was recorded saying, "f**k white people" (hereinafter the "FWP Statement" or "FWP") in a speech to her team.[1] If any high school coach makes such an inflammatory racist statement to students, that coach should be terminated. FCPS was compelled to terminate Bush's employment pursuant to its policies and the applicable law after she chose to say FWP to the children that she was entrusted to mentor.

Not only did Bush say FWP to children, but she repeatedly lied about it afterwards despite the fact that there is a recording of her making the FWP statement. To this day, Bush refuses to accept responsibility for making the FWP Statement as evidenced by her disingenuous failure to admit or deny that it was her voice on the recording. She reluctantly admits that she recalls making a similar comment to FWP to the students and that the recording does sound like her voice.[2] JA464; JA476; JA487.

Bush claims that she was not terminated for saying FWP *days* after she made the vile statement. Instead, she claims that she was terminated in retaliation for

---

[1] Bush made this statement in a meeting where at least one white student-athlete was present. JA238.
[2] Saying something similar to "f**k white people" is still grounds to terminate Bush's employment.

speaking out against racism *two years earlier* after basketball fans made racist comments to her players; for objecting to a disciplinary action she received *one year earlier* for yelling at a referee she accused of making a racist call about a play; and for objecting to disciplinary action she received *eight months earlier* for ignoring multiple FCPS directives to remove a Facebook post where she publicly complained about a high school player receiving post-season honors in violation of FCPS policies.[3]  She also claims the policies FCPS instituted to prevent fans from making racist comments after the first incident were inadequate, and the above disciplinary actions themselves constitute discrimination and a hostile work environment.

The District Court properly granted FCPS's Motion for Summary Judgment dismissing her claims, which it decided without considering Bush's Opposition to FCPS's Motion for Summary Judgment ("Opposition") because she filed it eight days after the deadline.

Bush's Notice of Appeal to this Court did not appeal the District Court's June 30, 2022 decision striking her Opposition, but her opening brief seeks to appeal that decision. This Court does not have jurisdiction to review the District Court's decision to strike the Opposition, but even if it did the decision should be affirmed because the District Court did not abuse its discretion.

---

[3] As discussed below, Bush also disingenuously attempted to deny making the unprofessional Facebook post about the high school scholar athlete.

This Court should affirm the District Court's decision granting FCPS's unopposed Motion for Summary Judgment because there are no genuine issues of material fact. If this Court reverses the decision striking Bush's Opposition and considers the Opposition, it should still affirm FCPS's Motion for Summary Judgment because the Opposition does not create any genuine issues of material fact.

## STATEMENT OF FACTS

### A.    Bush Was A Temporary, At-Will Employee With Her Assignment Ending At The End of the 2019-2020 School Year.

FCPS hired Bush as the head coach of the girls' basketball team for FHS. JA167. This was a temporary, at-will employment position. In the fall of each year, prior to the start of the basketball season, Bush signed an Assignment-Acknowledgment of Additional Pay, accepting the coaching assignment and acknowledging that the role was a temporary, at-will position. JA167; JA173. That Assignment Acknowledgement specifically states that the "assignment is considered a temporary at-will position for one season only." *Id.* The Assignment Acknowledgement also states: "I voluntarily accept the position as an at-will position, non-tenured." *Id.* At the same time she signed the Assignment Acknowledgement, Bush also signed the "Coach Acknowledgment," where Bush agreed to comply with the Board of Education policies and other FCPS regulations as they pertain to her employment. *Id.* FCPS maintains an Athletic Handbook that contains its expectations for coaches, including both job responsibilities and conduct expectations. JA167; JA202-205; JA301.

**B.    FCPS Has Policies Prohibiting Discrimination And Retaliation.**

During Bush's employment, FCPS maintained an equal employment opportunity and non-discrimination, harassment, and non-retaliation policy, making it clear that discrimination, harassment, and retaliation for reporting discrimination or retaliation were not tolerated amongst its employees. JA332.

**C.    FCPS Took Appropriate Remedial Acts In Response To Alleged Incidents At The 2018 Linganore Game.**

On or about Friday, January 19, 2018, Linganore High School ("LHS") hosted FHS for a junior varsity and varsity double-header game (hereinafter "the Linganore Game"). JA168; JA335. Both games were highly contested and competitive games that FHS won. *Id.* During the post-game handshake line, Bush and the head coach for LHS, Rachel Easterday ("Easterday"), made physical contact with one another. JA168. Both coaches felt it was the others' fault and that it was an intentional act. *Id.* Easterday complained that Bush and her team displayed poor sportsmanship by clapping and chanting directly at her after winning the game. *Id.* Upon returning to the FHS bench, an upset spectator approached Bush in a way she felt was threatening. JA168; JA242-244. The spectator, who was an LHS fan and not affiliated with FCPS, asked Bush why she was not teaching her students good sportsmanship. *Id.* Bush does not allege that this spectator said anything racial or discriminatory to her.  JA243. Bush responded to the spectator's comment by yelling, "Shut the f**ck up." JA168; JA242-244.

After speaking with her student-athletes in the locker room, the student-athletes told Bush that they were subject to insults and racial slurs by Linganore spectators. JA239-240. Bush did not hear any racial slurs yelled during or after the game. JA243-245. Bush was also told by an FHS parent that a white police officer on duty during the game spoke to the African-American parents of some of the members of her team in a threatening manner with his hand on his gun when they asked for his assistance with the crowd. JA240-242. Multiple members of the FCPS community who had been at the Linganore Game or who had heard about the Linganore Game, including Bush, complained to FCPS about those incidents. JA169; JA249. FCPS took Bush and the community's concerns very seriously and initiated an extensive investigation and action plan to address the incidents by January 22, 2018. *Id.*

Kevin Kendro, the FCPS Supervisor of Athletics & Extracurricular Activities, and Kathleen Schlappal, the FCPS Director of High Schools, spearheaded an investigation into both the accusations of racial slurs and gestures made toward the FHS girls basketball team and the physical contact made between the two head coaches. JA167-168; JA335. After their extensive investigation, Kendro and Schlappal could not determine if a racial slur was used or identify the individual(s) responsible for the use of racial slurs, and they could not determine whether the contact made between Bush and Easterday in the handshake line was accidental,

intentional, or who was at fault. JA339; JA169. They documented their investigation, findings, and recommendations in a 6-page report with over 100 pages of exhibits. JA169; JA335-340.

In addition to the investigation, as a direct result of the Linganore Game and in order to ensure similar instances would not occur in the future, FCPS:

- Held a meeting with all of the athletic directors and basketball coaches and then-FCPS Superintendent Dr. Theresa Alban on January 26, 2018, where Dr. Alban discussed the events of the Linganore Game, reiterated that FCPS had no tolerance for racial or derogatory slurs, and stressed the need to report any such incidents immediately so that the offender can be immediately removed from the game. JA342-343;

- Made an announcement to the student bodies of FHS and LHS the week after the Linganore Game emphasizing how FCPS would not accept or tolerate racial slurs or other derogatory comments and that such comments were never acceptable. *Id.*;

- Sent Dr. Alban and other FCPS administrators to attend both FHS and LHS basketball games. *Id.*;

- Facilitated meetings between Dr. Alban and other FCPS administrators and the student-athletes and parents from both FHS and LHS to address any concerns. *Id.*;

- Held the 2018 playoff game between FHS and LHS at a neutral location (Hood College) with increased security. JA170; JA253;

- Expanded cultural proficiency training to coaches and game officials, where it was previously only provided to Athletic Directors and other administrators. JA169; JA254; JA343;

- Amended its policy on extracurricular and co-curricular activities (Policy 509) to create a code of standards, reporting, and discipline policy for students, FCPS employees, volunteers, and spectators during extra-curricular activities. JA169-170; JA343; JA373;

- Established written mandatory reporting procedures for staff regarding racial slurs. JA170; JA343; JA347;

- Recorded and played a safety and sportsmanship message before every athletic contest, that includes warnings to spectators that "the use of racial, ethnic, homophobic or other derogatory or discriminatory language, slurs or practices are unacceptable and should be immediately reported to the athletic director or a school administrator." JA169; JA189; JA255; JA349;

- Sent Dr. Alban to all coaches' meetings for all sports the following school year to reiterate FCPS's expectations of coaches to immediately report and address any instances of racial or other derogatory slurs that occurred at extracurricular events. JA342;

- Encouraged professional mediation between Bush and Easterday. Bush, however, declined to participate. JA169; JA339;

- Suggested developing a joint message or video with Bush and Easterday to promote unity between the schools and provide closure to the community. Bush again declined to participate. *Id.*;

- Issued a letter to the spectator that approached Bush after the Linganore Game, indicating that his behavior was inappropriate and banning him from all remaining FHS games for the season. JA170; JA339; JA351.

**D.**  **FCPS Addressed Its Legitimate Concerns About Both Bush's and Easterday's Behavior After The 2018 Linganore Game And Did Not Retaliate Against Bush For Reporting What Her Players Witnessed At The Game.**

Kendro also recommended that each school administrator follow up on any sportsmanship issues that came to light as a result of the investigation. Those concerns included that Easterday yelled at the LHS Athletic Director after the Linganore Game, and Bush yelled "shut the f**ck up" at a spectator. JA168; JA170. Following the investigation recommendations, on or about February 26, 2018, Kendro asked the principals of both FHS and LHS to follow up and address those

issues. JA170; JA353-354. Kendro additionally asked the principal of FHS at the time, Kathy Campagnoli, to address with Bush the tone and tenor of an email Bush sent him about Dr. Alban that he felt was rude and inappropriate. JA354. How each principal addressed the issues related to Bush and Easterday was left to their discretion. JA170. Both principals confirmed to Kendro by mid-March 2018 that they had discussed the sportsmanship-related issues with Bush and Easterday. JA170; JA356-357. Bush was not demoted or suspended and did not lose pay as a result of this meeting, and she was brought back as head coach of the FHS girls basketball program the following year. JA252; JA282-283.

On or about March 1, 2018, Dr. Michael Markoe, the Deputy Superintendent, and Kendro met with both Bush, Easterday, and the principals and athletic directors of both FHS and LHS to discuss the logistics of the two teams meeting again in the playoffs at a neutral location and to discuss FCPS's expectations of their conduct as coaches moving forward. JA170.

Following each season, coaches are supposed to meet with their school Athletic Directors and/or school principals to do an "end of season evaluation." JA171. In April 2018, Campagnoli provided Bush with a memorandum meant to serve as an addendum to her End of Season Evaluation which encouraged Bush to speak to the media going forward (Bush often refused to give interviews to the Frederick News Post), implored Bush to practice good sportsmanship among coaches and stated that

she was expected to participate in a pre-season discussion with Easterday to promote good sportsmanship. JA361. Bush was not demoted or suspended and did not lose pay as a result of this evaluation, and Bush was brought back as Head Coach of the FHS girls basketball program the following year. JA282-283.

Finally, as Campagnoli discussed in the April 2018 memo, prior to the start of the basketball season, in about October 2018, Bush was asked to attend a meeting at the FCPS Central Office with Kendro, Easterday, and the Athletic Directors from LHS and FHS. JA171. Easterday agreed to the meeting, but Bush refused to attend. *Id.*

### E.   FCPS Appropriately Issued Bush A Letter Of Concern After Referee Complained About Bush's Behavior During A 2019 Basketball Game And Bush Admits That The Letter Was Not Discriminatory.

On or about January 15, 2019, the FHS varsity girls basketball team played a game at Walkersville High School ("WHS"). JA363. During the game, one of the WHS players, who is white, fouled one of the FHS players, who is African-American. JA269-276. The game officials ran toward the FHS player that was fouled and not the player that committed the foul. *Id.* This upset Bush because she thought that the game officials were treating her student-athlete as the aggressor and that the foul should have been an intentional foul. *Id.* As a result, she ran onto the court and yelled at the game officials. JA363.  After the game, one of the game officials complained to FHS that while Bush was yelling at the game officials during the event

described above, she called him a racist. JA363.  Bush denies calling the game official a racist during the game, but believes he was acting biased based on her players' race. JA273-274.  Keivette Hammond, the FHS Athletic Director (African-American, female), drafted a "Letter of Concern" to Bush explaining the proper procedure for Bush to go through if she disagreed with a call from a game official. JA371. The Letter of Concern provided that instead of running out on to the court and yelling at the officials when she disagreed with a call, the proper course of action is to immediately bring her concerns to Hammond. JA371. Bush admitted in her deposition that she did not believe that Hammond discriminated against her by providing her with the Letter of Concern following the Walkersville game. JA278-79. As a result of this incident and the Letter of Concern, Bush was not suspended or demoted. JA277-278; JA282-283; JA364. She did not have her yearly coaching stipend reduced. JA277. FHS subsequently brought Bush back as the head coach for the 2019- 2020 season. JA282-283; JA364.

**F.** **FCPS Appropriately Suspended Bush With Pay For One Game After She Insubordinately Refused To Remove A Facebook Post Discrediting A Student-Athlete And Refused To Admit That She Made The Post.**

Bush along with one other assistant coach of the FHS girls basketball team, were the co-administrators for a Facebook page called "FGB Power." JA180. FGB stands for Frederick Girls Basketball. JA226. On or about April 15, 2019, Bush authored a post on the FGB Power Facebook page sharing a news article from the

Frederick News Post that named an FHS player and another player within FCPS as "Co-Player of the Year" for girls basketball (hereinafter the "Co-Player of the Year Post"). JA179-180; JA212-213; JA377. In the Post, Bush questioned why the title of "Player of the Year," which traditionally is awarded to one player, ended in a tie. JA377. While the Co-Player of the Year Post did not mention Bush by name, it implied that it was written by a coach of the FHS Girls Basketball team. *See id.* (stating "Your Coaching staff & AD got you…I will make sure my kids are good (Period)"). The post also stated, "[p]eople ask me why I refuse to comment or interview with the Frederick News Post." *Id.* Bush is known to refuse to talk to the Frederick News Post. JA233; JA364.

Members of the community complained to the FHS administration about the Co-Player of the Year Post because it implied that the non-FHS player did not deserve to be Co-Player of the Year, and that it was inappropriate for an FCPS coach to make such a comment discrediting the accomplishments of an FCPS scholar athlete. JA364-365. The FHS administration agreed the Co-Player of the Year Post was inappropriate and also violated FCPS' social media policy. *Id.* The FCPS social media policy sets forth expectations for employees using personal social media pages to refrain from speaking on behalf of FCPS, communicating in an official capacity with FCPS students or their parents/guardians, and generating or discussing content related to identifiable FCPS students. JA373, JA379. The Co-Player of the

Year Post violated all of these directives because it communicated directly with parents and students, listed multiple FCPS students by name, re-posted content related to identifiable FCPS students, and appeared to be speaking on behalf of the FHS girls basketball team, even though the page was not an FCPS-sanctioned Facebook Page. JA364-365. For these reasons, on or about April 16, 2019, Hammond directed Bush to take the Co-Player of the Year Post down. JA227; JA385-386. After a few days had passed and the Co-Player of the Year Post had not been removed from the FGB Power page, Hammond directed Bush to remove the post a second time. JA365. She did not. *Id.* On April 23, 2019, the Principal of FHS, Dr. David Franceschina, directed Bush to immediately take the post down, but the post was still not removed. JA365; JA385. Dr. Franceschina emailed Bush again on April 24, 2019, to take the post down. *Id.* Bush took the post down on April 26, 2019, ten days after she was originally directed to take it down and only after four requests from her supervisors. JA387.

Bush met with Dr. Franceschina, Hammond, and FHS Assistant Principal Aaron Phillips on May 1, 2019, to discuss why it took so long for Bush to take down the post. JA365. During this meeting, Bush refused to acknowledge that she had authored the post. [4] *Id.* She demanded to know why the FHS administration assumed

---

[4] Bush did not admit to FHS that she authored this post. JA365. She also denied this in her initial responses to FCPS Interrogatories. JA212-213. Once FCPS filed a

she authored the post. *Id.* The FHS administration explained why they thought she had authored the post, and directly asked her if she was the creator of the post. *Id.* Bush refused to admit it was her. *Id.* Bush's failure to comply with four requests from supervisors to immediately take down the Co-Player of the Year Post amounted to insubordination. JA365; JA392.

During the May 1, 2019 meeting, Bush raised concerns about how FCPS handled the Linganore Game and issues of racial inequality that her players, not Bush, faced, and complained that a coach from Middletown had also posted on her Facebook page about the Frederick News Post's Player of the Year awards but was not asked to take her post down. JA365-366; JA392; JA396. Bush did not say she was being treated differently because of her race at the time. JA395-396. The Middletown Coach, Jessica Racz, is an unpaid, volunteer assistant girls basketball coach at Middletown High School. JA168. Racz's post was on her personal Facebook page and not a Facebook page that appeared to speak on behalf of the entire Middletown High School girls basketball team. JA365; JA390. Additionally, Racz's post expressed pride in her players and her opinion that some of them were worthy of more than an honorable mention. *Id.* Unlike Bush's post, the Middletown post was not implying that another specific student did not earn their award or should

---

Motion to Compel, Bush finally admitted, for the first time, that she did author the Facebook post. JA416.

not have received an award. *Id.* Regardless, Dr. Franceschina forwarded Bush's complaint about the Middletown Coach to the FCPS Central Office, and was told it would be addressed with the Middletown administration. JA365; JA394.

Due to Bush's repeated insubordination and lack of accountability, Dr. Franceschina issued her a Letter of Reprimand on June 4, 2019, suspending her from the first game of the 2020 basketball season and warning her that further violations of FCPS regulations and policies would result in further disciplinary action, up to and including termination. JA366; JA396.

To address Bush's concerns about the racial inequality that her players had faced, Dr. Franceschina asked Bush to meet with Dr. Keith Harris, the FCPS Executive Director of Achievement and Equity. JA365-366. Bush initially refused to do so, but eventually met with Dr. Harris after Dr. Franceschina's continued insistence. JA366; JA259-260.

Bush did not lose any part of her coaching stipend as a result of the suspension. JA282-283; JA366. Per FCPS policy, Bush was given 30 days to appeal her suspension. JA344. Bush did not take advantage of this opportunity in a timely fashion. *Id.* She did, however, submit an appeal of her suspension to Dr. Alban six months later on December 4, 2019. JA344; JA398. In her appeal, Bush reiterated the same complaints about the Middletown Coach's Facebook post she made to Dr. Franceschina in May 2018, and then, for the first time, stated how she believed she

was being treated differently than the Middletown coach because of her race. JA398.

Despite the fact that the appeal was untimely, Dr. Alban agreed to hear the appeal.

JA344; JA405-406. FCPS set the appeal hearing for February 11, 2020. JA237;

JA344. Bush failed to appear at the hearing. JA235-237; JA344.  As a result, FCPS

did not take any further action related to Bush's appeal and upheld her suspension.

JA344.

### G.    **FCPS Rightfully Investigated Bush After Five Of Her Varsity Players Quit The Team En Masse And Alleged Bush Was "Emotionally Abusive."**

On February 5, 2020, shortly before playoffs were set to begin for the FHS

girls basketball team, three senior girls abruptly quit the varsity team. After learning

about the three seniors quitting, Bush canceled normal basketball practice and

instead held a team meeting in a classroom at FHS. JA216.  In that meeting were

Bush, two assistant coaches, a third party named Anthony Montgomery who is not

affiliated with FCPS, and about eight of the student-athletes remaining on her team.

JA217-218; JA414-415; JA426-429. During this team meeting, Bush shared her own

personal experiences with the sport including anecdotes of Bush's first-hand

knowledge and familiarity with systemic discrimination within the sport and

educational system. JA414-415, JA238-239.  As discussed further below, Bush told

the players during that meeting ". . . fuck white people. That's right. That's where

I'm at . . . ." JA476.  Bush concluded the meeting with an activity she called, "Protect

16

Your Environment Circle Activity" in an attempt to control what the players said about the meeting and to pit the children against their former teammates and the FHS administration. JA415. In that activity, she drew a circle on the whiteboard with the names of the players still on the team and identified alleged bad influences outside of the circle that could break down the team's unity, including the girls that left the team, other coaches, and the FHS administration. JA408; JA427-429; JA433. Bush was literally undermining the FHS administration by telling the team not to trust them. Next to those outside influences, she wrote what to tell those influences about the situation. *Id.* For instance, the students were to tell teachers and alumni that the players left based on "team policy" or a "team violation." JA408. Bush was literally telling the children to lie about why the players left the team.

In the days after they quit the team, the three students and their parents explained to the FHS administration that the girls quit the team due to what they described as mental and emotional abuse by Bush. JA366. They complained that Bush:

- Used curse words at players;

- Singled players out and yelled at them;

- Fostered a culture of fear;

- Created a "cult of personality" where others would protect her from wrongdoing;

- Intentionally created a rift between seniors and other members of the team;

- Failed to support players in recruitment for post-secondary opportunities;

- Made physical contact with a player during a game;

- Acted unprofessionally by showing her 2019 Letter of Reprimand from FHS regarding the Facebook issue to parents in an effort to coordinate a message of unity; and

- Assigned athletes what to say when asked about the girls that had quit. JA366-367; JA432-433; JA437-438; JA467-480.

Shortly after the first three varsity players abruptly left the team, two additional varsity players quit. JA366; JA432. It is highly unusual and concerning that five members of a varsity sport to quit all at the same time right before playoffs, particularly when many of the seniors were pursuing post-secondary basketball opportunities. JA171; JA366; JA432. FHS immediately began investigating the complaints and interviewed other members of the current team, previous members of the team, parents, the assistant coaches, and Bush. JA366-367; JA432-433.

In its preliminary investigation, the FHS administration did not find additional evidence to substantiate specific claims of "abuse." JA366-367; JA433; JA475. However, the FHS administration had serious concerns about Bush's professionalism, cursing in front of student-athletes, pushing students further than they were capable of being pushed, and displaying a lack of knowledge about the

capabilities of her players. JA367; JA433; JA475. At the start of the investigation,

FHS had not yet made the decision about whether to bring Bush back as head coach

for the 2020-2021 basketball season and planned to weigh these concerns and what

it learned in this investigation heavily in its decision. JA367; JA475.

**H.  FCPS Terminated Bush's Employment After She Was Recorded Saying "F**k White People" To Student-Athletes In A Public Classroom.**

While FHS was conducting its investigation into the five varsity players

quitting the team, a recording began circulating on Facebook that purported to be

Bush making incendiary and inappropriate remarks to her student-athletes (the

"Recording"). JA367; JA433. The Recording appeared to be a clip of a larger

conversation and stated:

> …And I use sports to make you guys so damn strong that
> we can get to the point of, and I apologize for saying it,
> but fuck white people. That's right. That's where I'm at,
> um, especially with how society is and so I think
> sometimes I go overboard… JA462; JA367; JA433;
> JA476.

The FHS administration became aware of this "FWP Statement" on or about the

morning of February 14, 2020, after it was widely circulated on Facebook. JA171;

JA367; JA433. Principal David Franceschina, Assistant Principal Erik Engelstatter,

and Assistant Principal Aaron Phillips are familiar with Bush's voice, and they all

believed the FWP Statement sounded like Bush. JA367; JA433.

19

On February 14, 2020, Dr. Franceschina called a meeting with Bush, himself, Engelstatter, and Hammond to determine if Bush made the FWP Statement and the context of the full statements. JA367; JA433; JA476. Dr. Franceschina opened the meeting by reading the transcript of the recording and asking Bush if she remembered making those comments. JA367; JA434; JA464. Bush admitted that the comments sounded familiar and that she remembered making similar comments, but did not recall the exact wording. *Id.*

Dr. Franceschina then played the audio of the FWP Statement and asked Bush if it was her on the Recording. *Id.* Bush admitted that it was her on the Recording, but did not specifically remember saying those exact words. *Id.*; JA207.[5]

When Franceschina asked Bush the context of the FWP statement, she immediately admitted that the comments were made "in the classroom" at FHS during the aforementioned February 5, 2020 meeting after the three seniors quit.[6] JA367-368; JA434; JA464; JA476-477. Bush explained that the context of the FWP Statement was that she was speaking to the players about adversity that the team faced and because she was a black woman, leading a team of young black women in a system that never had their back. *Id.* Based on the fact that Bush had admitted to

---

[5] During her deposition, Bush attempted to backtrack by testifying that the voice on the Recording sounds like her, but that during the February 14, 2020 meeting she only said it "sounds like" her, not that it was her, and she did not remember saying those exact words. JA207.

[6] At least one white student-athlete was present during the meeting. JA238.

20

making the highly inappropriate statement to children, Dr. Franceschina suspended Bush pending a further investigation. JA367; JA434; JA476.

Following Bush's suspension, FCPS interviewed multiple students who were in the February 5, 2020 team meeting where Bush said the FWP Statement. JA368; JA423-424; JA477-479; JA485. When FCPS read the transcript of the FWP Statement and asked if Bush had said those words, several students did not deny that Bush made the statement, but were reluctant to admit that she made the statement. JA434; JA477-479; JA485. However, two students in the room during the February 5, 2020 meeting stated that they believed the voice on the Recording sounds like Bush, and one stated that she remembered Bush saying something similar but could not recall the exact words she used. JA423-424; JA430.

In these interviews, the student-athletes also shed further light on FCPS's earlier investigation. The student-athletes confirmed that Bush used curse words including "f**k" and yelled at players. JA478-479; JA485. The parents of one player articulated concerns that the girls basketball team was "cult-like." JA434; JA437-438; JA479.

Based on the facts that Bush did not deny making the FWP Statement, she admitted that the recording sounded like her, she admitted that, at the very least, she said something similar to FWP, the FHS administration reasonably believed the recording sounded like Bush's voice, one student admitted that Bush said something

similar to FWP during the February 5, 2020 team meeting, two students confirmed the voice on the FWP recording sounded like Bush and the fact that the administration had concerns about how Bush led her team from the earlier investigation, Dr. Franceschina decided to terminate Bush's employment. JA368; JA434-435. On February 18, 2020, Dr. Franceschina, Engelstatter, Phillips, and Hammond gave Bush a copy of her termination letter, which stated that Bush violated the FCPS anti-discrimination policy and her employment was terminated effective immediately. JA368; JA435; JA465; JA477-480; JA485; JA487; JA452-453. The letter also provided, "Adults are to serve as role models for the students they work with; the divisive words you spoke to your players do not represent the values of our school system." JA452. Despite her termination prior to the end of the basketball season, Bush received her full coaching stipend for the 2019- 2020 season. JA286.

## **PROCEDURAL HISTORY**

On May 14, 2021, Bush filed the Complaint alleging discrimination on the basis of her race and sex/gender. JA10.  Throughout the litigation, Bush displayed nothing but blatant disregard for deadlines. For example, during discovery, Bush failed to respond to FCPS's discovery requests and FCPS filed a Motion to Compel. JA4.  Bush did not oppose this motion and it was later granted by the District Court. *Id.* The District Court also ordered Bush to produce documents by the date specified

by the Court, but she did not comply. JA4; JA833-834. Bush also failed to file a Discovery Deadline Status Report, as required by the District Court. *Id.*

The Scheduling Order relevant to this case required all dispositive motions to be filed by May 12, 2022. The Scheduling Order did not otherwise set a deadline for the responses to dispositive motions. Accordingly, the local rules control when the responding motions were to be filed. FCPS filed its Motion for Summary Judgment ("Motion") on May 12, 2022. JA83. Pursuant to Local Rule 105.2(a), Bush's Opposition was due on May 26, 2022. Bush did not file her Opposition until June 3, 2022. JA491.

FCPS timely filed a Motion to Strike Bush's Opposition, requesting the District Court strike it from the record and not consider the Opposition in deciding the Motion for Summary Judgment because it was untimely. JA762. Bush filed an opposition to the Motion to Strike. JA791. While the Motion to Strike was pending, in an abundance of caution, FCPS filed a Reply dated June 17, 2022. JA768. On June 29, 2022, the District Court held a hearing on the issues, and granted FCPS's Motion to Strike Bush's Opposition. JA839. Thereafter, Bush filed a Motion for Reconsideration, which FCPS opposed. JA841; JA918. The District Court denied Bush's Motion for Reconsideration. JA928.

On January 12, 2023, the District Court granted FCPS' Motion for Summary Judgment. JA954. On February 2, 2023, Bush filed a notice of appeal of the January

12, 2023, decision. JA960. On February 3, 2023, this Court entered a Docketing Notice for this case, which required Bush to file a Docketing Statement on February 17. Dkt No. 2.  Thirteen (13) days after the deadline and after receiving a reminder from this Court, Bush filed the Docketing Statement on March 2, 2023. Dkt No. 11.

## SUMMARY OF THE ARGUMENT

Bush is time-barred from appealing the June 30, 2022 Order granting FCPS' Motion to Strike her Opposition to FCPS' Motion for Summary Judgment. Bush failed to designate this issue in her Notice Appeal and, to date, Bush has yet to appeal that Order, so this Court lacks jurisdiction over the appeal.

Even if Bush had timely appealed the June 30, 2022 Order, the District Court's decision should be affirmed because it properly exercised its discretion to strike Bush's Opposition. In considering the factors set forth in *Pioneer Inv. Servs. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993), the District Court determined that Bush's failure to timely file her Opposition was not due to excusable neglect.

The District Court declined to extend Bush's deadline to file her Opposition, so it considered FCPS' Motion for Summary Judgment unopposed. The District Court properly granted FCPS' Motion for Summary Judgment because there are no genuine issues of material fact in dispute. However, even if the District Court considered Bush's Opposition, the Opposition did not raise additional issues of material fact.

## STANDARD OF REVIEW

The District Court's decision to strike Bush's Opposition is reviewed for an abuse of discretion. *See Lewis v. Hoke Cnty.*, No. 22-6171 at *3 (4th Cir. May 24, 2022) (reviewing a district court's decision to strike a reply brief for abuse of discretion). Under this standard of review, the appellate court affords the District Court's rulings "substantial deference," and will not overturn the ruling unless the decision was "arbitrary and irrational." *United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011) (quoting *United States v. Weaver*, 282 F.3d 302, 313 (4th Cir. 2002)). A court only abuses its discretion "when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises." *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012) (internal citations omitted).

The grant of summary judgment is reviewed *de novo*. *Lauture v. St. Agnes Hosp.*, 429 Fed. App'x 300, 304 (4th Cir. 2011). Summary judgment is appropriate when the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To withstand a motion for summary judgment, the non-movant must put forth competent and significantly probative evidence to create genuine issues of material fact on each element of each claim. *Celotex*, 477 U.S. at 325. Failure to establish any of the essential elements of

a claim compels summary judgment. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128-30 (4ᵗʰ Cir. 1987).

## ARGUMENT

### A. Bush is Time-Barred from Appealing the Order Granting FCPS' Motion to Strike Bush's Opposition to FCPS' Motion for Summary Judgment.

The June 30, 2022, Order granting FCPS' Motion to Strike Bush's Opposition is not before this Court because it was not timely appealed.

Under Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure, plaintiffs are allotted 30 days after a final decision to file a Notice of Appeal. The District Court's final decision is dated January 12, 2023. JA954. As a result, any appeal of the Order granting FCPS's Motion to Strike Bush's Opposition was due by Monday, February 13, 2023.

On February 2, 2023, Bush filed a Notice of Appeal, which states, "Notice is hereby given that Ashley Bush, Plaintiff in the above captioned case, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the **order of this Court granting Defendant, Frederick County Public Schools', Motion for Summary Judgment entered on January 12, 2023**." JA960. It is clear on its face that the only Order Bush appealed via her Notice of Appeal is the January 12, 2023, Order granting FCPS's Motion for Summary Judgment, and not the June 30, 2022 Order striking Bush's Opposition. JA960. The District Court's docket entry 81

shows that the only Order that Bush manually selected when she electronically filed the Notice of Appeal was the Order granting FCPS's Motion for Summary Judgment. JA8.

Pursuant to Federal Rule of Appellate Procedure 4(a)(5)(A)(i), Bush had 30 days, or until March 15, 2023, to move for an extension of time to file a Notice of Appeal in the District Court. After Bush filed her untimely docketing statement in this Court on March 3, 2023 (Dkt. No. 11), a reoccurring theme in this case, FCPS filed an objection to Bush's docketing statement on March 13, 2023, on the grounds that Bush had never appealed the Order granting FCPS's Motion to Strike Bush's Opposition to Appellee's Motion for Summary Judgment. (Dkt. No. 17.)  Bush still had two more days to move for an extension of time to file the Notice of Appeal in the District Court, but she did not (even though she was on full notice of the deficiency).

Her failure to timely appeal that issue means that this Court lacks jurisdiction over the appeal. *See Panhorst v. U.S.*, 241 F.3d 367, 369 (4th Cir. 2001) (this Court lacked jurisdiction over an appeal of the entry of Summary Judgement when the notice of appeal was untimely filed); *James v. Verizon*, 458 F. App'x 262, 263 (4th Cir. 2011) (this Court could not consider appellant's informal brief regarding the district court's underlying grant of Summary Judgment because her notice of appeal of that order was untimely); *United States v. James*, No. 20-7895, 2022 U.S. App.

27

LEXIS 28219, at *5 (4th Cir. 2022) (granting a motion to dismiss an appeal that was filed after the required deadline because "the timeliness of a notice of appeal is a mandatory rule").

Bush is attempting to piggyback the June 30, 2023 Order striking her Opposition onto her Notice of Appeal of the January 12, 2023 Order granting Summary Judgment, but she is prohibited from doing so because Bush's Notice of Appeal did not indicate an intent to appeal the June 30, 2022 Order. Remarkably, Bush could have corrected the issue after FCPS specifically identified the deficiency in its objection to her docketing statement, but she chose to continue to ignore the applicable rules and deadlines.  This is especially concerning given that the reason why her Opposition to FCPS's Motion for Summary Judgement was struck was because she missed the deadline and she is engaged in the same dilatory conduct on her appeal.

Bush is literally asking the Court to endorse and reward her blatant, repeated and knowing disregard for the applicable rules and deadlines.  This Court should not entertain such a request under these circumstances and should deny her appeal on the basis that it has no jurisdiction to review the Order granting FCPS's Motion to Strike Bush's Opposition.    JA839. *See Jackson v. Lightsey*, 775 F.3d 170, 176 (4th Cir. 2014) (Court lacked jurisdiction to review an order that dismissed frivolous claims when it was not included in the appellant's notice of appeal); *Foster v. Tandy*

*Corp.*, 828 F.2d 1052, 1059 (4th Cir. 1987) (since appellant's notice of appeal addressed only the grant of a judgment notwithstanding the verdict, the Court had no jurisdiction to review the entry of directed verdict); *Jones v. Prince George's Cty*, 355 F. App'x 724, 728 (4th Cir. 2009) (notice of appeal which explicitly referenced one order for Summary Judgment but failed to designate a separate order for Summary Judgment did not grant the court jurisdiction to hear the non-designated order); *Cain v. Johnson*, 293 F. App'x 216 (4th Cir. 2008) (since appellant specifically stated in his notice of appeal he was appealing from an order denying his motion to stay, the Court had no jurisdiction to hear an appeal on an order denying leave to proceed *forma pauperis*).

**B.    <u>The District Court's Decision to Strike was an Appropriate Use of its Discretion.</u>**

If this Court nevertheless considers Bush's appeal of the District Court's June 30, 2022, Order striking Bush's Opposition despite its lack of jurisdiction, it should affirm the District Court's Order.

Maryland District Court Local Rule 105.2(a) states: "All motions must be filed within deadlines set by the Court. Unless otherwise ordered by the court, all memoranda in opposition to a motion shall be filed within fourteen (14) days of the service of the motion and any reply memoranda within fourteen (14) days after service of the opposition memoranda."

FCPS filed its Motion for Summary Judgment on May 12, 2022. JA83. Pursuant to Local Rule 105.2(a), Bush's Opposition to FCPS's Motion for Summary Judgment was due on May 26, 2022. JA491. Bush did not file her Opposition until June 3, 2022. JA491. Bush did not seek any extension of time from FCPS's counsel or the Court regarding her Opposition, and she did not offer any justification as to why she filed the Opposition late.

FCPS moved to strike Bush's Opposition on June 7, 2022. On June 17, 2022, Bush opposed the Motion to Strike, claiming that her Opposition was untimely filed due to a scheduling error. JA791.

Local Rule 105.2(a) does not provide the consequence for a failure to meet the prescribed deadline. Thus, the district court may, in its discretion, decide whether to consider an untimely opposition or treat the motion as unopposed and deem the facts in the motion "uncontroverted." *See H & W Fresh Seafoods, Inc. v. Schulman*, 200 F.R.D. 248, 252 (D. Md. 2000); *Gillum v. Pilot Travel Centers, LLC*, No. WDQ-14-0173, 2015 U.S. Dist. LEXIS 80601, at *8 (D. Md. June 22, 2015) (citing *Curtis v. Evans*, No. 2003-2774, 2004 U.S. Dist. LEXIS 9611, at *1 (D. Md. May 27, 2004)).

A court only abuses its discretion "when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises." *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012) (internal citations omitted).

In this case, striking Bush's late filed Opposition was fully within the District Court's discretion because it thoroughly analyzed the factors that establish excusable neglect. *See Lewis v. Hoke Cnty.*, No. 22-6171, 2022 U.S. App. LEXIS 14451, at *2 (4th Cir. 2022) (holding that the district court did not abuse its discretion by striking an appellant's reply briefs as untimely filed). The District Court's Order striking Bush's Opposition should be affirmed because it was not, "arbitrary and irrational," and it is entitled to "substantial deference." *United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011) (quoting *United States v. Weaver*, 282 F.3d 302, 313 (4th Cir. 2002)).

## 1.   In Applying the *Pioneer* Factors, the District Court Properly Struck Bush's Opposition.

When determining whether there is good cause to extend a deadline, courts consider whether a party's failure to timely file was due to excusable neglect. *Pioneer Inv. Servs. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993). Courts consider four factors when determining whether excusable neglect exists: (1) the potential prejudice to the non-moving party; (2) the length of the delay; (3) the reason for the delay; and (4) whether the party seeking the extension acted in good faith. *Id*. In assessing these factors, the District Court properly determined that Bush's untimely filing did not rise to the level of excusable neglect, so there was no good cause to extend the deadline for Bush's untimely filing. JA839.

### a.    Bush Has No Good Reason For The Delay

The most important factor is the party's reason for missing the deadline. *Thompson v. E.I. DuPont de Nemours & Co., Inc.*, 76 F.3d 530, 534 (4th Cir. 1996). As such, even if the Court were to determine that Bush's counsel did not act in bad faith and extending the deadline would not prejudice FCPS, Bush cannot overcome the fact that she missed the filing deadline due to her counsel's inattention and lack of diligence. *See B&G Bldg. Maint., Inc. v. NLRB*, 123 F. App'x. 551, 553 (4th Cir. Jan. 6, 2005)  (quoting *Hospital Del Maestro v. NLRB*, 263 F.3d 173, 175 (1st Cir. 2001) ("Even if all of the other factors weigh in favor of the untimely party, neglect is not excusable 'when there is no proffered reason that would justify, or . . . plausibly explain, [the] misreading of the rules.'").

Bush failed to allege any reason outside of her control that caused her to miss the deadline to file her Opposition to FCPS's Motion for Summary Judgment. JA491.  Bush's counsel claimed to have relied on Fed. R. Civ. P. 56 ("Rule 56") in believing that her Opposition was due twenty-one days after FCPS's Motion for Summary Judgment was filed. JA791. However, the provision of Rule 56 that prescribes a time to file a response has not been part of the Rule for twelve years. *Id*. This provision was deleted from Rule 56(b) as part of the 2010 amendments and the current version does not address the time for filing a response. Fed. R. Civ. P. 56(b).

An inadvertent miscalculation of a deadline is not "good cause" excusing one's failure to meet a court deadline. *See Peters v. City of Mt. Rainier*, No. GJH-14-00955, 2014 U.S. Dist. LEXIS 137146, at *37 (D. Md. Sep. 29, 2014) (finding no good cause or excusable neglect when attorney miscalculated a court deadline); *Silivanch v. Celebrity Cruises, Inc*., 333 F.3d 355, 370 (2d Cir. 2003) (holding that "the district court abused its discretion when it decided that [defense] counsel's determination of the wrong date by which [defendant] had to file a notice of appeal constituted excusable neglect"); *Lowry v. McDonnell Douglas Corp*., 211 F.3d 457, 464 (8th Cir. 2000) (failure to calculate correctly the thirty-day appeal period was "garden variety attorney inattention," and the district court abused its discretion in holding that "experienced counsel's misapplication of clear and unambiguous procedural rules" was excusable neglect).

The District Court relied on *Feargrounds, LLC v. Old Time Contractors, Inc.*, Nos. WDQ-10-87 & WDQ-10-88, 2010 U.S. Dist. LEXIS 42701, at *1 (D. Md. Apr. 30, 2010). ECF No. 61 Trans. at 69.[7] In *Feargrounds*, the appellant filed an untimely

---

[7] As discussed above, it is FCPS's position that FCPS's Motion to Strike is outside the scope of this appeal. However, Bush argues that the motion was incorrectly decided, yet does not include the June 29, 2022 transcript of the hearing on the Motion to Strike in the Joint Appendix. The transcript provides the District Court's reasoning in striking Bush's Opposition and is important to a full understanding of the issue. JA7, Docket No. 61. Pursuant to Fed. R. App. P. Rule 30(b), the record is on file with the Clerk and available to the Justices, and counsel may refer in briefs and in oral argument to relevant portions of the record not included in the joint appendix.

opposition to appellee's Motion for Summary Judgment. 2010 U.S. Dist. LEXIS 42701, at *2. The attorney later indicated that he had "misread[] the rules governing the time for filing the opposition." *Id.* at *4. In doing so, he relied on an outdated Rule 56. *Id.* at *6. The bankruptcy court did not consider the untimely opposition. *Id.* at *7. The *Feargrounds* court affirmed the decision, finding that "counsel's error was not misreading Fed. R. Civ. P. Rule 56, but the failure to consult the Local Bankruptcy Rules," which required the response to be filed within 14 days. *Id*. at *6. Similarly, Bush claims to have relied on an outdated version of Fed. R. Civ. P. Rule 56 and failed to consult the Local Rules of this Court. JA791. Bush's failure to diligently litigate her case does not constitute excusable neglect. *See Robinson v. Wix Filtration Co*., 599 F.3d 403, 413 (4th Cir. 2010) ("A party that fails to act with diligence will be unable to establish that his conduct constituted excusable neglect.").

Further, Bush's contention that her missed deadline was based on a "shared mistaken belief" is ill-founded. JA791; Dkt No. 23 at 13. First and foremost, FCPS's belief as to the filing deadline is irrelevant, yet she continues to argue that FCPS's belief somehow saves her untimely filing. *Id.* As the District Court properly noted, Bush's error may not be excused by turning the blame on FCPS. ECF No. 61 Trans. at 73. Parties are not required to keep track of the other parties' deadlines or inform them when they have missed a deadline. Further, FCPS did not mislead Bush into

filing her Opposition late. FCPS merely did not correct her when she stated the wrong due date, which it was not required to do. Bush missed the deadline on her own and she must take accountability for her own actions. Bush is required to make her own diligent effort to stay abreast of the applicable deadlines.

### b.    Bush Did Not Act In Good Faith

As to the fourth factor, in assessing whether Bush acted in good faith, the District Court took a holistic approach and considered the entire context of the case including Bush's history of tardiness.  ECF No. 61 Trans. at 73-77. In her Appeal Brief, Bush claims to have had the "utmost effort into litigating her claims."  Dkt No. 23 at 11. However, Bush has shown nothing but habitual tardiness in her actions in the trial court as well as this appeal. During discovery, FCPS had to file a Motion to Compel based on Bush's failure to respond to its discovery requests, which Bush failed to oppose. JA4; JA762.  Thereafter, Bush failed to comply with the Court's Order and produce the documents by the date specified by the Court. JA4; JA833-834. Additionally, Bush failed to file a Discovery Deadline Status Report as required. *Id.*  Bush's untimeliness placed considerable burden on FCPS of filing papers for relief and on the District Court in providing judicial intervention.[8] Considering Bush's pattern of not abiding by the District Court's rules, orders, and

---

[8] Bush repeated this behavior in this appeal by failing to file a notice of appeal on the Order granting FCPS's Motion to Strike Bush's Opposition, and again when she untimely filed her Docketing Statement.

procedures, the District Court did not conclude that Bush acted in good faith. ECF No. 61 Trans. at 73-77.

In her Appeal Brief, Bush continues to offer excuses for her tardiness but no accountability. Dkt No. 23 at 21-24. Bush contends that she did not oppose FCPS's motion to compel because it was her impression that FCPS would withdraw the motion. *Id.* at 22. It is true that FCPS agreed to withdraw its motion to compel once Bush fully complied with its discovery requests but, as Bush admits, she failed to do so for several weeks. *Id.* at 23. Accordingly, FCPS did not withdraw its motion and Bush should have filed an opposition or asked the District Court for an extension of time to oppose.

Bush also asserts that she could not file the required Status Report when it was due because she was out of office from April 12 -18, 2022. *Id.* However, the District Court set forth the date for the Discovery Deadline Status Report in its March 2, 2022 Scheduling Order. Bush had well over a month to prepare this report before she went out of office, and she should have provided the information before going away. Regardless of Bush's excuses, the fact remains that she has exhibited a pattern of tardiness that has continued in this appeal, which cannot be ignored.

### c. The Length of Bush's Delay Caused Prejudice to FCPS

The other two *Pioneer* factors, length of delay and prejudice to the non-moving party, also weigh in favor of a finding that Bush's neglect was inexcusable.

As to the prejudice factor, given the untrue and outright offensive allegations in the Complaint and in the belated Opposition, FCPS was prejudiced every single day that this case was not disposed of, including all eight days that Bush extended this litigation by failing to file her Opposition by the deadline.

In addition to impacting the briefing schedule in this case, the length of the delay factor also favored FCPS. This is not an instance where a party innocently miscalculated the deadline by one or two days. As discussed above, the filing of the Opposition was over a full week late because Bush relied upon an obsolete rule that changed twelve years earlier. Fed. R. Civ. P. 56(b)(2009).

The District Court's decision directly aligns with the precedent of this Court. *See Lewis v. Hoke Cnty.*, No. 22-6171, 2022 U.S. App. LEXIS 14451, at *1 (4th Cir. May 24, 2022) (holding that the district court did not abuse its discretion by striking an appellant's reply briefs as untimely filed). For these reasons, the District Court did not abuse its discretion by determining that there was no excusable neglect for the belated filing, and it properly struck Bush's Opposition.

### 2. Bush Failed to Preserve for Appeal Any Argument that the Factors Governing Default Judgments are Applicable to the Instant Case.

In Bush's Motion for Reconsideration, Bush contended, for the first time, that the District Court should have used the *Payne* factors governing default judgments in considering FCPS's Motion to Strike, rather than the factors set

forth in *Pioneer*.[9]  JA842. The District Court properly relied on the *Pioneer* factors when striking Bush's Opposition. Bush does not and cannot cite any authority to show, or even suggest, that the Court's reliance on the *Pioneer* factors constituted legal error.

In the instant appeal, Bush continues to apply the *Payne* factors to her untimely filing. Dkt No. 23 at 15-27. Since Bush waited until her Motion for Reconsideration to assert this issue, she failed to preserve any argument as to it on appeal. Accordingly, this Court should not consider Bush's argument that the District Court failed to adequately weigh the *Payne* factors.

Generally, issues that were not raised in the district court will not be addressed on appeal. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (explaining that issues not raised in district court will not be considered on appeal unless the "refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice"); *United States v. One 1971 Mercedes Benz 2-Door Coupe*, 542 F.2d 912, 915 (4th Cir. 1976) (explaining that the failure to raise and preserve issue in district court waives consideration of that issue on appeal absent exceptional circumstances).

---

[9] *Payne v. Brake*, 439 F.3d 198, 204-05 (4th Cir. 2006) establishes six factors that district courts should consider when deciding default judgments.

An issue presented for the first time in a motion pursuant to Federal Rule of Civil Procedure 59(e) generally is not timely raised; accordingly, such an issue is not preserved for appellate review unless the district court exercises its discretion to excuse the party's lack of timeliness and consider the issue. *Holland v. Big River Mins. Corp.*, 181 F.3d 597, 605 (4th Cir. 1999) (appellant failed to preserve for appeal a constitutional argument that was not raised until their Rule 59(e) motion for reconsideration); *United States v. Riley*, No. 20-7446, 2021 U.S. App. LEXIS 30543, at *2-3 (4th Cir. Oct. 13, 2021) (by not presenting an argument until his motion for reconsideration, Appellant failed to preserve this issue for appellate review).

Bush's opposition to FCPS's Motion to Strike did not argue that the *Payne* default judgment factors applied, nor did she refer to it during oral argument, or at any other point prior to filing her Motion for Reconsideration. JA796; ECF No. 61 Trans. at 50-62. Instead, Bush relied upon the *Pioneer* factors in her opposition and during oral argument. JA796; ECF No. 61 Trans. at 50-62. Consistent with the authority discussed above, this issue is not preserved for appeal due to Bush's failure to raise this issue at any point before filing her Motion for Reconsideration. The District Court properly rejected her untimely argument and denied her Motion for Reconsideration. JA928. Accordingly, this Court should not consider Bush's application of the *Payne* factors because the issue was not properly preserved for appeal.

Putting aside that any argument that the *Payne* factors apply is untimely, those factors are not applicable here. Bush argues that the order striking her summary judgment Opposition deprived her of the opportunity to have judgment determined on the merits of her case, which is tantamount to a judgment by default, so the District Court should have applied the *Payne* factors governing default judgments when considering FCPS's Motion to Strike. This argument is without merit.

Contrary to Bush's assertions, striking an opposition to a motion for summary judgment is not equivalent to a default judgment. Where, as here, a court strikes an opposition, the court is still required to independently assess the motion for summary judgment, not just grant the motion without review. *See Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) (holding that when considering a motion for summary judgment, the court "must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law"). The instant case is an example of this. Indeed, the District Court expressly stated that granting FCPS's Motion to Strike did not mean FCPS was entitled to a default judgment:

> "I will also be clear, if there is any confusion, that the Court still is obliged to evaluate the pending Motion for Summary Judgment in accordance with Rule 56. So simply because something is unopposed does not by definition mean that it is granted. So I still have to evaluate it in accordance with the law."

(ECF No. 61 Trans. at 83:2-7.). For these reasons, the *Payne* default judgment factors are not applicable here.

Even though the *Payne* factors governing default judgments are not applicable, the District Court considered many of the themes set forth in *Payne* in deciding to strike Bush's Opposition. ECF No. 61 Trans. at 68-77. These factors include whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic. *Payne*, 439 F.3d 198, 204-05.

These factors do not support a finding that the District Court erred in striking Bush's Opposition. As it pertains to a history of dilatory actions, the District Court found that Bush did, in fact, have a history of dilatory actions (ECF No. 61 Trans. at 75:24-77:9). Bush failed to abide by clear discovery rules: Judge Blake's Order, the applicable Scheduling Order, and the Order granting FCPS's Motion to Compel. *Id.* As such there is a clear history of dilatory actions.

In considering personal responsibility, it must be noted that Bush's counsel has taken absolutely no responsibility for missing her deadline. Her lack of accountability was on full display throughout the hearing. As the District Court noted, Bush tried to blame her failure on everyone except for herself including FCPS and an obsolete Rule 56(b). (ECF No. 61 Trans. at 72-73).

Further, Bush's contention that she should not be held responsible for her counsel's failure to timely file her Opposition to FCPS's Motion for Summary Judgment is without merit. Dkt No. 23 at 19-21. It is well-settled that a party voluntarily chooses her attorney as her representative in an action, and cannot later "avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) (finding that the district court did not abuse its discretion in dismissing a case, where the petitioner's counsel failed to appear at a duly scheduled pretrial conference and had been deliberately proceeding in dilatory fashion); *see also Gayle v. United Parcel Serv., Inc.*, 401 F.3d 222, 226 (4th Cir. 2005) (finding that attorney negligence, including allowing a client's case to fall through the cracks, is not an "extraordinary circumstance justifying equitable tolling"). Rather, "a civil plaintiff may be deprived of his claim if he failed to see to it that his lawyer acted with dispatch in the prosecution of his lawsuit." *Link*, 370 U.S. at 634 n.10.

Additionally, Bush could not present a "meritorious defense" because as discussed below, there are no genuine issues of material fact. Even considering the *Payne* factors, the District Court's decision to strike was still an appropriate use of discretion.

C.    **The District Court's Order Granting FCPS's Motion for Summary Judgment Should Be Affirmed, Whether Or Not Bush's Opposition Is Considered.**

The District Court properly granted FCPS's unopposed Motion for Summary Judgment without considering Bush's Opposition because there are no genuine issues of material fact. In reaching its decision, the District Court not only considered the facts alleged in FCPS's Motion, but it also considered the facts and legal arguments in Bush's Complaint, and her deposition testimony, and assumed they were true.

Under Federal Rule of Civil Procedure 56, "[i]f the non-moving party fails to make a showing 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the district court is required to grant summary judgment." *Pulley v. KPMG Consulting, Inc.*, 348 F. Supp.2d 388, 393 (D. Md. 2004), aff'd, 183 F. App'x. 387, 388 (4th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Bush now asks this Court to reverse the District Court's decision to strike her Opposition, and to consider the facts and arguments raised in her Opposition. Even if the Opposition is considered, the District Court's decision should be affirmed because it does not create genuine issues of material fact about the central issues of this case.[10]

_____

[10] It is worth noting that sixteen of the twenty-two exhibits attached to her Opposition are the same exhibits FCPS attached to its Motion for Summary Judgment. It is also worth noting that Bush's dilatory actions continue into this Court because she included two exhibits that were not appropriately part of the record. One of these

The Opposition relies on unproven allegations in the Complaint, uncorroborated self-serving statements, and other irrelevant or inadmissible exhibits that cannot create issues of material fact or meet her burden of proof at summary judgment.

1. **Bush's Discrimination Claims Under Title VII (Counts I & II) and MFEPA (Count VIII) Were Properly Dismissed.**

The District Court properly granted FCPS summary judgment on Bush's claims alleging discrimination based on race and sex.

    a. **The District Court Properly Limited Bush's Title VII And MFEPA Claims To The Events Surrounding Her Termination In February 2020.**

As an initial matter, Bush's claims for race and sex discrimination were greatly limited by the applicable statute of limitations and Bush's failure to exhaust her administrative remedies. Specifically, Bush did not exhaust her administrative remedies for any act of alleged discrimination, retaliation, or harassment stemming from the 2018 Linganore Game, the 2019 Walkersville Game, and the 2019 Co-Player of the Year Facebook Post.

Under Title VII and Maryland Fair Employment Practice Act ("MFEPA"), a plaintiff must exhaust her administrative remedies before filing suit. *Sloop v.*

---

exhibits (Bush's discovery responses, JA641-647) was stricken because it contains personal information about minors. JA839; ECF No. 61 Trans. at 44, 77-78. Another exhibit (Doerrer Affirmation, JA716-720) would have been stricken as untimely disclosed, but Judge Rubin granted FCPS's Motion to Strike the Opposition, so FCPS's Motion to Strike the Doerrer Affirmation was moot. JA839; ECF No. 61 Trans. at 74-78.

*Memorial Mission Hosp., Inc.*, 198 F.3d 147, 148 (4th Cir. 1999); *Banks v. Bd. of Educ.*, 2020 U.S. Dist. LEXIS 25368 at *12 (D. Md. Feb. 12, 2020). The primary purpose of the administrative exhaustion requirement is "notice [to] and conciliation [with]" the defendant. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). With respect to Title VII claims, the Fourth Circuit has "held that the scope of the plaintiff's right to file a federal lawsuit is determined by the [EEOC] charge's contents" to prevent a plaintiff from "rais[ing] claims in litigation that did not appear in [her] EEOC charge." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012).

A plaintiff can only litigate claims expressly raised in the administrative charge of discrimination, reasonably related to the charge, or reasonably expected to grow out of the investigation of the charge. *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005). Pursuant to 42 U.S.C. § 2000e-5(e)(1), all claims under Title VII are required to be filed with the EEOC within 300 days of the alleged unlawful conduct. The court may not consider discrete discriminatory acts outside of the 300-day limitations period. *Byington v. NBRS Fin. Bank*, 903 F. Supp. 2d 342, 349 (D. Md. 2012) (citing *AMTRAK. v. Morgan*, 536 U.S. 101, 105 (2002)).

In this case, Bush filed her Charge with the EEOC on December 14, 2020, exactly 300 days after her termination on February 18, 2020. JA455. Any earlier allegation was therefore time-barred, including those related to the Linganore Game, the Walkersville Game, and the Co-Player of the Year Facebook post.

45

The "continuing violations" doctrine does not save Bush's claims based on the Linganore Game, the Walkersville Game, or the Co-Player of the Year Facebook post. As an initial matter, Bush did not check the "continuing action" box on her Charge, which precludes her from now asserting that theory. *See Conney v. Ameri-Klean Servs., Inc.*, No. RDB-17-3583, 2018 U.S. Dist. LEXIS 30081, at *6 (D. Md. Feb. 26, 2018) (conduct before 300 days could not be considered where plaintiff did not check the "continuing action" box on the Charge form); *Coleman v. Masonic Home of Va.*, No. 3:12-cv-682, 2013 U.S. Dist. LEXIS 6057, at *16 (E.D. Va. Jan. 15, 2013) (plaintiff could not rely on incidents of discrimination that occurred more than 300 days before the Charge because she did not check the "continuing violations" box.)

Additionally, the events and consequences of these other allegations are discrete acts of alleged discrimination. It is well established that the continuing violations theory does not apply to discrete acts of discrimination. *AMTRAK v. Morgan*, 536 U.S. 101, (2002); *Janey v. N. Hess Sons, Inc.*, 268 F. Supp. 2d 616, 623 (D. Md. 2003). Whether an act is "discrete" depends upon whether the alleged act "[has] a degree of permanence which would trigger an employee's awareness and duty to assert his or her rights." *Dachman v. Shalala*, 46 F.Supp.2d 419, 435 (D. Md. 1999).

46

The Fourth Circuit has explicitly rejected the theory that a "continuing violation" could be based on a plaintiff's claim that time-barred acts were related to an, "overarching policy of discrimination." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 220 (4th Cir. 2007). That is exactly Bush's theory, that FCPS had a general policy of discrimination that created a continuing violation, and it must likewise be rejected. Each of Bush's untimely allegations about "behavior modification" and "coaching evaluation" after the Linganore Game in 2018, the "letter of concern" she received after the Walkersville Game in 2019, and the "letter of reprimand" and suspension she received in 2019 after the Co-Player of the Year Facebook Post incident all constitute discrete acts taken by different FCPS employees months or years apart. *See, e.g. Munive v. Fairfax Cnty. Sch. Bd.*, 2017 U.S. Dist. LEXIS 25020, *9 (D. Md. Feb. 21, 2017), *aff'd in relevant part*, 700 F. App'x. 288, 289 (4th Cir. 2017)) (recognizing letter of reprimand as discrete act); *Battle v. Burwell*, No. PWG-14-2250, 2016 U.S. Dist. LEXIS 127202, at *6 (D. Md. Sept. 19, 2016) (declining to extend the continuing violation doctrine to alleged discrimination in a performance evaluation because it was a discrete act); *Blount v. Dept. of Health and Human Services*, 400 F. Supp. 2d 838, 842 (D. Md. 2004) (finding that an incident where the plaintiff was verbally criticized was a discrete act). These separate, unrelated incidents are clearly not all part of a single claim, so they cannot establish an ongoing, continuing violation. *See Crockett v. SRA Int'l*, 943 F. Supp. 2d 565,

572 (D. Md. 2013) ("the five instances of alleged discrimination following the 2005-2006 failure to promote are too distinct from each other in terms of time and content to constitute a continuing violation.") Because all of Bush's pre-termination allegations relate to discrete acts of alleged discrimination, they were time-barred and could not be saved by the continuing violations doctrine. *See Morgan*, 536 U.S. at 113 (explaining that discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging the act).

### i.   <u>The Opposition Raises No New Facts Or Arguments.</u>

Even if the District Court considered the Opposition in reaching its decision, the Opposition presented no new facts or legal arguments.  The District Court properly held that most of Bush's allegations were time barred because the court cannot consider discrete discriminatory acts that occur outside of the 180- or 300-day limitation period.  JA941.

The District Court determined that Bush, "may redress here only those discrete acts that 'occurred' within the 180-day time period of her administrative complaint."[11]

---

[11] The limitations period in this case is 300 days.  *See EEOC v. R&R Ventures*, 244 F.3d 334, 338 n.1 (4th Cir. 2001) ("In a deferral state such as Maryland, a charge is timely if it is filed with the Commission within 300 days of the last alleged act of discrimination and served on the company within ten days of being received by the EEOC. 42 U.S.C. § 2000e-5(e) & (e)(1).").

The Opposition argues that FCPS forfeited its argument that allegations more than 300 days prior to her EEOC Charge cannot be considered because FCPS did not file a motion to dismiss Bush's claims based on older allegations. JA500-501. Bush cites *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019) in support of her argument. JA500-501.

In *Fort Bend*, the Supreme Court rejected a defendant's argument that the district court lacked jurisdiction over a religious discrimination claim that was not asserted in the plaintiff's EEOC charge, which it first raised after years of litigation (including a prior appeal to the Supreme Court). *Fort Bend Cty. v. Davis*, 139 S. Ct. at 1848, 1852. The Supreme Court held that the EEOC charge filing requirement was not jurisdictional, so it could be forfeited by a defendant who did not timely raise it. *Id*.

*Fort Bend* is entirely inapposite because FCPS timely asserted the failure to exhaust argument as an affirmative defense in its Answer to the Complaint. JA777. FCPS is not arguing that the District Court lacked jurisdiction over Bush's claims, or that the claims should be dismissed because they were not asserted in the Charge. FCPS simply argues that Bush's claims cannot be supported by incidents that occurred outside of the limitations period. Bush cannot survive a motion for summary judgment by citing a legal theory that does not apply to her case.

However, even if the Opposition is correct and FCPS forfeited its argument that the prior acts are time barred, the prior acts still do not raise any genuine issues of material fact for trial. The Opposition argues that after Bush complained about racial inequities from 2018 forward, FCPS discriminated and retaliated against her by taking the following adverse employment actions: (1) requiring Bush (and not the Linganore coach) to take training after the Linganore Game; (2) issuing a Letter of Concern after the referee complaint; and (3) suspending Bush for one game for ignoring multiple directives to remove a Facebook post. JA517, JA522-523.

The District Court considered these actions (even after determining they were time barred) and noted that Bush was not demoted or suspended, nor did she suffer any wage related penalty or punishment. JA934, JA935, JA936. Thus, even if the District Court had rejected FCPS's timeliness arguments, the time-barred actions Bush identifies are not adverse employment actions because she was not fired or demoted nor did she suffer any loss of pay as a result, so they do not establish discrimination or retaliation. *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 437 (D. Md. 2012) (suspension with pay is not an adverse employment action); *Adams v. Anne Arundel Cty. Pub. Schools*, 789 F.3d 422, 429 (4th Cir. 2015) (written warnings and verbal reprimands did not qualify as adverse employment actions.)

Most importantly, FCPS's actions after the Linganore Game, the Walkersville Game and the Facebook post were not discriminatory in the first place. Bush

complains that FCPS counseled her on her behavior, issued disciplinary letters to her, suspended her for a game, and terminated her employment, but it is undisputed that these actions did not include any reference to Bush's race or sex. There is simply no evidence that Bush's race was a motivating factor in FCPS's performance management decisions.

First, Bush was counseled after the Linganore Game because she cursed at a fan who criticized her sportsmanship without reference to her race, and she sent a rude and inappropriate email to Kevin Kendro, FCPS Supervisor of Athletics & Extracurricular Activities JA170; JA243; JA252; JA353-354. Second, Bush received a Letter of Concern after the Walkersville Game because she yelled at a referee who she perceived as racist. JA363-364. Bush admits that this counseling was not discriminatory. JA278-279; JA363-364. Third, Bush received a Letter of Reprimand and was suspended for one game for insubordination because she ignored multiple directives to remove a Facebook post, again entirely unrelated to her race or sex. JA214-215; JA364-366; JA385-386. FCPS's actions were standard, managerial acts resulting from Bush's own behavior that the Court cannot second guess. *See Rowe v. Marley Co.*, 233 F.3d 825, 831 (4 Cir. 2000) ("[Personnel decisions are] the kind of business decisions that we are reluctant to second-guess"); *Bryan v. Lucent Techs., Inc.*, 307 F. Supp. 2d 726, 738 (D. Md. 2004) ("it is not for this court to second-guess an employer's assessment.")

51

### b.   Bush Failed to Provide any Evidence that FCPS's Reason for Termination (FWP Statement) was False.

The District Court properly dismissed Bush's Title VII claims because there is no evidence that FCPS's legitimate reasons for her termination were pretextual and discriminatory.

A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether race motivated the employer's adverse employment decision. *See Diamond v. Colonial Life & Accident Ins. Co*., 416 F.3d 310, 320 (4th Cir. 2005), citing 42 U.S.C.A. § 2000e-2(m) (as long as race motivated the adverse action, the plaintiff can establish an unlawful employment practice).

Under [the McDonnell Douglas] 'pretext' framework, "the employee, after establishing a *prima facie* case of discrimination, [must] demonstrate[] that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id*., citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods*, 530 U.S. 133, 153 (2000). The ultimate burden of proving discriminatory animus and intentional discrimination remains at all times with the plaintiff. *St. Mary's*

52

*Honor Center v. Hicks*, 113 S. Ct. 2742, 2752 (1993); *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).

In this case, there is no direct or circumstantial evidence indicating race was a motivating factor in FCPS's decision to terminate Bush's employment. Proceeding under the *McDonnell Douglas* framework, the District Court held that even if Bush had established a *prima facie* case, FCPS was entitled to judgment as a matter of law because there is no evidence that the reason for her termination was false or a pretext for discrimination. JA945. FCPS articulated a legitimate and non-discriminatory reason for terminating Bush's employment—i.e. that she said "f**ck white people" to students in the immediate aftermath of five players quitting her team and alleging emotional abuse. JA83. The FHS principal considered the statement inconsistent with school values and FCPS's policy against discrimination. JA945.

Since FCPS articulated a legitimate, non-discriminatory reason for Bush's discharge, Bush was required to provide sufficient evidence to prove that FCPS's reasons for her discharge was pretextual and that the real reason for her discharge was because of her race or sex. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 320 (4th Cir. 2005) (summary judgment for defendant employer affirmed on discrimination claim where plaintiff failed to produce "sufficient evidence of pretext 'to avert summary judgment.'")

Bush failed to provide any evidence that the real reason for termination of her employment was discrimination or retaliation. JA945. At most, she claimed that FCPS was wrong for firing her based on the FWP Statement because it could not definitively prove that it was her voice on the Recording. JA491. However, Bush has no evidence to refute that the decision-makers in this case at FHS honestly believed that it was Bush on the recording saying "f**ck white people" to students. JA83. *See Holland v. Washington*, 487 F.3d 208, 220 (4th Cir. 2007) (when the decisionmaker honestly believed plaintiff made physical threats towards his supervisor, it was irrelevant whether the plaintiff actually made the threats.); *Middlebrooks v. University of Maryland*, 980 F. Supp. 824, 831 (D. Md. 1997) ("Speculation and belief are insufficient to create a fact issue as to pretext … Nor can pretext be established by mere conclusory statements of a plaintiff who feels that she has been discriminated against.")

Bush herself and multiple students and associates have confirmed that the FWP Statement sounds like Bush, and at least one student in the team meeting on February 5, 2020, recalled that Bush made a "similar statement" during the meeting. JA423-444.

For these reasons, the District Court properly granted FCPS judgment as a matter of law because Bush could not prove FCPS's reason for terminating her employment was pretext for discrimination or retaliation. *See Diamond v. Colonial*

*Life & Accident Ins. Co*., 416 F.3d 310, 320 (4th Cir. 2005) (affirming summary judgment in favor of employer on discrimination claim where the plaintiff failed to produce "sufficient evidence of pretext to 'avert summary judgment.'") (quoting *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004)).

## i. <u>The Opposition Raises No New Facts Or Arguments.</u>

The Opposition argues that the true reason for the termination was discrimination and retaliation, and FCPS's purported reason for terminating Bush's employment based on the recording is a pretext for discrimination because FCPS shifted its rationale by identifying its investigation into abuse allegations as a reason for her termination, in addition to the Recording. JA517-521.

Even if the District Court had considered this argument, there is no shifting rationale that indicates pretext. It is entirely consistent for FCPS to terminate Bush's employment for two violations of school policy - a racist comment and also her use of profanity with student athletes who she pushed too hard.

The Opposition relies heavily on character statements from parents and team members who support her. JA518-519. The substance of the statements, that Bush is a good, kind, and caring coach who seems to have been targeted, is entirely irrelevant and cannot raise a genuine issue of material fact as to FCPS's motivations because they are third parties' opinions and hearsay.

Likewise, the Opposition's contention that players quit her team because they were not good enough to play at Division 1 colleges, does not create a factual dispute because it is not relevant to any of her claims, and Bush admits the reason why the players quit is irrelevant. JA519 ("it is also a genuine issue of material fact in dispute whether five of the Frederick High School Girl's Varsity Basketball Team members quitting is relevant to this case or the allegations contained herein.")

The Opposition also argues that FCPS's decision to terminate her employment based on the Recording is pretext for discrimination and retaliation because FCPS was inconsistent in identifying how it received the Recording. JA519. Assuming that FCPS said it uncovered the Recording while conducting its investigation, and also said it was sent to school officials anonymously, there is no inconsistency because both could easily be true. More importantly, the source of the Recording is not relevant to FCPS's decision to terminate Bush's employment. JA519.

The Opposition also claims FCPS's decision is pretext for discrimination because FCPS has not proved the adult woman's voice on the recording belongs to Bush, and it might not be hers. JA519-521. This is the ultimate red herring in this case. It is not relevant if the voice is Bush – what is relevant to FCPS's decision to terminate her employment are the facts it had at the time: (1) it sounded like her; (2) she admitted it sounded like her; (3) she admitted that she said something similar to FWP and provided the context of the statement; and (4) she did not deny that she

said FWP. JA367-368. She cannot create a genuine issue of material fact for trial simply by refusing to admit or deny her own actions.

The Opposition claims that comparable FCPS teachers and coaches engaged in similar behavior and received less severe consequences, which proves that FCPS's justification that Bush violated its employment policies was a mere pretext for retaliation. JA515-516, JA522. However, the Opposition does not cite any facts to dispute that her proposed comparators work at different schools than Bush, and one is an unpaid volunteer coach and two are tenured teachers covered by a collective bargaining agreement. JA168; JA344; JA365; JA513. Nor does the Opposition cite any facts to dispute that the proposed comparators engaged in different actions than Bush. JA509; JA513; JA516.

Even if the District Court had considered the pretext issues arguments in the Opposition, Bush's discrimination and retaliation claims must still be dismissed.

### 2.    <u>Hostile Work Environment (Count VII)</u>

The District Court properly dismissed Bush's hostile work environment claim. To establish a *prima facie* case of a hostile work environment and avoid summary judgment, Bush had to prove: (1) she experienced unwelcome conduct, (2) based on her race or sex (3) that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was

57

imputable to her employer. *Ocheltree v. Scollon Prods.*, 335 F.3d 32, 331 (4th Cir. 2003); *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006).

According to Bush's deposition testimony, she based her hostile work environment claim on the lack of validation and "protections" from FHS administration when she spoke up for her players in relation to the Linganore and/or Walkersville Games. JA250. Presumably she is referring to the disciplinary actions she received for calling a referee racist and ignoring requests to remove a Facebook post and, it stands to reason, her termination. These isolated, discrete acts are insufficient to support a hostile work environment claim. *AMTRAK v. Morgan*, 536 U.S. 101, 115 (2002) (explaining that hostile work environment claims are different in kind from discrete acts and because their very nature involves repeated conduct, hostile work environment claims cannot be said to have occurred on any particular day). For this reason alone, the District Court properly granted FCPS summary judgment as to this claim. *See White v. City of Annapolis*, No. JFM-13-1330, 2015 U.S. Dist. LEXIS 110771, *12 (D.Md. Aug 21, 2015), aff'd, 639 F. App'x. 209 (4th Cir., May 12, 2016) (granting summary judgment because the handful of discrete incidents cited by the plaintiff did not constitute a hostile work environment).

More importantly, Bush did not personally experience any of the alleged hostile incidents. This is the first element of a hostile work environment claim, that a plaintiff, "experience unwelcome harassment." *Baqir*, 434 F.3d at 745. Bush

testified that she did not hear racial slurs coming from the crowd at the Linganore Game, she only learned about it in the locker room after the game. JA239; JA256. Bush did not witness an officer at the game keep his hand on his gun when speaking with parents.  JA240-242.  Bush also testified that she did not experience any unwelcome conduct based on her race at the Walkersville Game, and that the referee did not say anything racial (or related to her gender).  JA273.  Like the Linganore Game, the Walkersville Game involved alleged conduct towards her players, not towards Bush personally and not in her capacity as an employee.  JA273-275.  Bush cannot establish a hostile environment claim based on acts directed at her players.

The District Court also noted that Bush neither alleged nor proffered evidence of a hostile work environment on the basis of her sex/gender. JA947.  All of Bush's claims based on the Linganore Game, the Walkersville Game, or the Co-Player of the Year Facebook post were time-barred. However, Bush confirmed none of the conduct during the Linganore Game or Walkersville Game was based on sex. JA278-279. Additionally, Dr. Franceschina did not say anything about her sex during the Co-Player of the Year Facebook Post incident, or during her suspension and termination. JA195-196; JA367-368.  As such, Bush failed to establish a dispute of fact as to sex/gender-based hostile work environment.

### a.     <u>The Opposition Raises No New Facts Or Arguments.</u>

The Opposition argues that the pre-termination facts should be considered because they are part of a continuing violation based on a pattern and practice of events that combine to create a hostile work environment. JA497. However, the events that occurred in different school years cannot establish a pattern of harassment or hostility because Bush's temporary employment ended each year at the end of the basketball season, and Bush was rehired each year to resume her part time temporary coaching role at the beginning of the next basketball season. Bush was only employed to coach for approximately six months at a time, so she was not even part of the allegedly hostile FCPS school environment during the other six months of the year.

The District Court was fully aware of Bush's argument that she was continually subjected to a hostile work environment based on events beginning with the Linganore Game in 2018. JA942 (noting that Bush asserts hostile work environment claims and her EEOC Charge Form identified the earliest date of alleged discrimination as January 19, 2018 (the date of the Linganore Game)).

The District Court considered the (untimely) acts that, according to Bush, constitute a hostile work environment, and it rejected her claim because they are discrete, disconnected acts that were neither severe nor pervasive. JA743. The District Court properly held that Bush failed to prove harassment that is,

60

"sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive atmosphere," because, "[t]hese isolated, discrete acts are insufficient to support a hostile work environment claim." JA946.

The Opposition argues without citation that FCPS, "was aware of the offensive conduct occurring at games and took no significant actions to address it, quell it, or alleviate it." To the contrary, the District Court set forth the laundry list of all of the actions FCPS took after the Linganore Game (which the Opposition does not dispute).[12] JA933-934. And, most importantly, the policies were effective, because Bush herself admitted that she did not hear any racial slurs from the crowd during basketball games after they were implemented. JA266.

The Opposition does not contain any other facts or legal arguments that the District Court did not consider.

### 3.    Breach of Written Employment Agreement (Count III)

FCPS was also entitled to judgement as matter of law as to Bush's breach of contract claim because Bush was undoubtedly an at-will employee. This is clear from the language of the Assignment-Acknowledgement that Bush signed. JA173.

In Maryland, employment relationships are presumed to be at-will, terminable by either party at any time. *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432

---

[12] Bush testified that, prior to the Linganore Game in 2018, there were games when the players "were called monkeys," but she does not claim to have raised it to FCPS's attention at the time.  JA266.

A.2d 464 (1981). There are limited exceptions to the at-will employment doctrine where employer policy statements, such as those found in handbooks and on employment applications, create an implied contract of continued employment. *Bender v. Suburban Hosp.*, 134 Md. App. 7, 49–50 (Md. Ct. Sp. App. 2000). This occurs "when, with knowledge of [the policy's] existence, employees start or continue to work for the employer." *Dahl v. Brunswick Corp.*, 277 Md. 471, 476, 356 A.2d 221 (1976) (holding that severance pay policy was part of an employment contract).

Nevertheless, Maryland courts have refused to find the existence of an implied employment contract when there is an express disclaimer that policies do not create a contract. *See Fournier v. United States Fidelity & Guar. Co.*, 82 Md. App. 31, 42, *cert. denied*, 319 Md. 581 (1990) (holding that an employee could not rely on termination procedures found in an employee manual as a contract because, when he applied for the position, he acknowledged, in writing, that he could be terminated "at-will").

The Assignment-Acknowledgment that Bush signed on September 26, 2019, unequivocally and conspicuously states in multiple places that her position was an "at-will" position. JA173. As the District Court properly determined, this alone establishes that there was no intent by FCPS to enter into a contract with Bush. JA954. *See Fournier*, 82 Md. App. at 42 (employee could not rely on termination

procedures found in an employee manual because he acknowledged, in writing, that he could be terminated "at-will," which constituted a disclaimer of contractual intent).

In her deposition, Bush was unable to articulate how FCPS allegedly breached the Assignment-Acknowledgment. JA287-291. At best, Bush was only able to say that her breach of contract claim was based on the fact that she "was terminated for a reason that [she] felt should not have been cause for termination." *Id.* However, as the District Court correctly noted, FCPS could terminate an at-will employees' employment, like Bush, for any reason whether or not Bush agreed that the reason justified termination. JA954. *Shapiro*, 661 A.2d at 20.

Bush's Complaint argues that FCPS's discrimination policy is a promise not to terminate her employment for discriminatory reasons, and Bush accepted the promise, thereby creating a contract. JA947 (according to Bush's Complaint, "Frederick County Public Schools policies specifically prohibit discrimination and harassment in any form. In participating in both discriminatory and harassing behavior, Defendants have violated their own policies that govern the provisions of the employment agreement, thereby breaching material elements of the agreement.") While FCPS agrees that it cannot terminate any of its employees as a result of illegal discrimination, no FCPS policy created an implied contract with Bush.

Maryland courts have declined to find an implied contract if the employer's publication only makes a general statement of policy that could not be applied to specific employees. *See, e.g., MacGill v. Blue Cross of Md.*, 77 Md. App. 613, 618-19, 551 A.2d 501, *cert. denied*, 315 Md. 692, 556 A.2d 673 (1989). In *Bender*, 134 Md. App. at 49–50, Maryland Court of Special Appeals ruled that anti-discrimination language in an employer's bylaws "clearly falls into the latter category of promises" that are not contractual undertakings under Maryland law. *Id.* at 50. The same is true in this case. The language of the policy in the instant case, like in *Bender*, was "aspirational and not contractual" such that it cannot be the subject of a breach of contract suit. *Bender,* 134 Md. App. at 49.

The District Court properly held that the FCPS discrimination policy to, "provide an environment that is free from discrimination and harassment based on a person's membership in a protected class," is a general statement that would not make a reasonable person believe it provided any measure of job security, so the policy does not change the at-will nature of Bush's employment. JA332; JA949. The District Court held that the policy did not create a contract between Bush and FCPS because these statements are not definitive promises or statements, and they are too vague to be considered contractual undertakings under the law. *MacGill*, 77 Md. App. at 619.

Since there was no contractual relationship between the parties, FCPS was entitled to judgment on Bush's breach of contract claim.

### a.     The Opposition Raises No New Facts Or Arguments.

The Opposition argues that FCPS could not terminate Bush's employment for violating its discrimination policy and simultaneously deny that its discrimination policy creates an enforceable employment contract. JA534. However, there is no inconsistency because FCPS did not terminate her employment for breach of contract – it terminated her employment because it was enforcing its expectations for employees and the general school community to treat one another with respect and to not make racist statements to children. JA786.

The Opposition also argues that both Bush and FCPS had an expectation she would continue as coach for consecutive seasons year after year, and she engaged in some job activities after her Assignment-Acknowledgement ended each season. JA531-532. Even assuming the parties expected Bush to continue employment year after year, at all times she was still employed at-will, and her employment was not immune from termination for any of the same reasons year-round full-time teachers and staff could be terminated.

### 4.     Wrongful Termination (Count IV)

The District Court properly granted summary judgment on Bush's wrongful termination claim because it is preempted by Title VII and MFEPA. JA949-950

("Because the alleged discrimination is addressed statutorily, the public policy exception to at-will termination is precluded.")  Title VII and MFEPA each have their own exclusive statutory remedies which preclude Bush from recovering in tort.

Maryland courts recognize an at-will employee has a wrongful discharge claim against an employer only if the employee was discharged in violation of some "clear mandate of public policy." *Parks v. Alpharama, Inc.*, 25 A.3d 200, 213 (Md. 2011).

It is well settled that, "[w]here the public policy foundation for the abusive discharge claim is expressed in a statute, and that statute already contains a remedy for vindicating the public policy objectives, then judicial recognition of an abusive discharge claim is considered both redundant and inappropriate." *Gaskins v. Marshall Craft Assocs., Inc.*, 110 Md. App. 705, 715 (Md. Ct. Spec. App. 1996) (finding plaintiff's wrongful discharge claim preempted by Title VII and Art. 49B of the Maryland Code); *see also Makovi v. Sherwin-Williams Co*., 316 Md. 603, 626 (Md. 1989) (affirming dismissal of a wrongful discharge claim because the Title VII claim provided both the right and remedy, resulting in no unremedied public policy violation).

In this case, Title VII of the Civil Rights Act and the Maryland Fair Employment Practices Act preempt a common law wrongful termination claim because they are statutory claims prohibiting the same conduct that are based on the

same underlying facts. *See Chekey v. BTR Realty, Inc.*, 575 F. Supp. 715 *8 (D. Md. 1983) ("Maryland courts have not recognized a judicial exception to the terminable at will doctrine for a violation of clear public policy where a statutory exception already exists to redress violations of that public policy.")

Bush testified that her wrongful termination claim is based on the same allegations that she was wrongfully terminated because she was racially discriminated and/or sexually discriminated and/or retaliated against because she reported discrimination. JA291. Therefore, Bush's tort claim for wrongful discharge was preempted by Title VII and MFEPA.

### a.      The Opposition Raises No New Facts Or Arguments.

The Opposition argues that, "[t]he public policy that was violated was FCPS's failure to adhere not only to their own anti-discrimination policy, but also state and federal anti-discrimination laws that they are legally bound to comply with as a public school." JA529.

This is the exact same basis for her Title VII and MFEPA claims, which the District Court specifically considered and rejected. The Opposition did not assert any other facts or legal arguments.

### 5.      Violation of Maryland's Wiretap Statute (Count V)

FCPS was entitled to summary judgment as to Bush's wiretap claim. The District Court properly dismissed this claim because Bush had no standing to bring

the claim under the plain language of the Wiretap Act because she refused to admit it was her voice on the Recording.  JA952.

Section 10-410 of the Act creates a civil remedy for persons whose communications were illegally "intercepted, disclosed, or used." Md. Code Ann., Cts. & Jud. Proc. § 10-410. Accordingly, to make her case, Bush would have to prove that her oral communication was intercepted, disclosed, or used in violation of the statute, and that FCPS was responsible for intercepting, disclosing, or using (or procuring any other person to do the same).

Bush is trying to have it both ways, because she neither admits nor denies making the FWP Statement, nor does she admit or deny that she was the person on the Recording. JA495-496; Dkt No. 23. Without admitting that she was actually recorded, Bush cannot establish a "concrete injury," so she has no standing or legal basis to bring a cause of action for violation of the Wiretap Act.

### a.    The Opposition Raises No New Facts Or Arguments.

There are no new or different facts or arguments in the Opposition that could have changed the District Court's opinion.  The District Court properly dismissed Bush's wiretap claim because, "Plaintiff maintains that she is not the individual on the audio recording."  JA952.

The District Court held that, unless she admitted it was her voice, Bush could not prove that "her oral communication was intercepted, disclosed, or used in

violation of the statute," which, "necessarily foreclosed an action under the Maryland Wiretap Act." JA952. Nor could Bush prove that FCPS was, "responsible for intercepting, disclosing, or using [her oral communication] (or procuring any other person to do the same)." JA952. The Opposition doubles down, arguing that, "Defendant contends that the identity of the declarant is the Plaintiff. … These contentions are unsettled". JA538.

The Opposition tries to have it both ways, arguing that if Defendant can prove the recording is her voice, then the recording was illegally intercepted because Bush had a reasonable expectation of privacy during the team meeting in a school classroom (even though it is undisputed that the meeting included third parties, and student athletes could discuss the meeting with their parents even though Bush attempted to manipulate the students not to speak to anyone outside of her purported circle of trust). JA539.

The Opposition offers no logical explanation how Bush can pursue a wiretap claim on a contingent theory because the claim only exists "for persons whose communications were illegally intercepted."[13] It is not FCPS's burden to prove the voice belongs to Bush, and Bush cannot prove this essential element of a wiretap claim because she will not admit the voice is hers.

_____

[13] The District Court rejected the idea that Bush could have it both ways, noting, "Curiously, Plaintiff's wiretap claim is pled as contingent upon a determination that the recording is of her own voice." JA952.

69

Even assuming the voice is hers, and even if she was illegally recorded, it still makes no difference because it is undisputed that FCPS accessed the recording from Facebook. After it was disclosed to the world on Facebook, FCPS had no reason to believe the Recording had been illegally recorded, so FCPS could not possibly have engaged in the "willful … use of impermissibly intercepted communications," when it relied on the recording when it decided to terminate her employment. Md. Code Ann., Cts. & Jud. Proc. § 10-402(a). *See also* Md. Code Ann., Cts. & Jud. Proc. § 10-401(2)(c)(7)(i) (it is lawful to "access an electronic communication made through an electronic communication system that is configured so that the electronic communication is readily accessible to the general public.").

Thus, even if the District Court had considered Bush's Opposition, her refusal to admit the recording is her voice is the death knell for her wiretap claim.

### 6.    Defamation (Count VI)

The District Court properly granted summary judgment as to Bush's Defamation claim because it was barred by the statute of limitations. An action for defamation must be filed within one year from the date it occurs. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-105.

According to Bush's deposition testimony, the alleged defamatory statements were made during FCPS's investigation that was conducted between February 14, 2020 and February 18, 2020. JA952-953. Bush did not assert her

70

defamation claim until May 4, 2021 (more than a year later), so it was properly dismissed. JA953.

### a.      The Opposition Raises No New Facts Or Arguments.

The Opposition does not raise any other material facts, and it is consistent with Bush's deposition testimony, that the defamation claim is based on FCPS's investigation into the FWP statement, which ended on February 18, 2020 when FCPS terminated Bush's employment. JA537 ("The defamation that the Plaintiff experienced was due to the Defendant's use, disclosure, and proliferation of the audio recording that they allege to be the voice of the Plaintiff.")

As to legal arguments raised in the Opposition, Bush asserted that filing an EEOC charge, "should also toll the time for her defamation state-law claim." JA536. Bush boldly, incorrectly, argues that, "it would not have been possible for the Plaintiff to file her defamation [sic] separately from the other charges as the defamation clam is closely tied with the discriminatory acts of the Defendant," and, "the Plaintiff is owed equitable tolling for her defamation claim as she could not file suit before the EEOC had completed its investigation." JA537. This premise is completely false because there are no administrative remedies for Bush to exhaust before she can file a defamation claim. Bush could have filed a defamation claim any time before the statute of limitations expired in February 2021.

Even though it did not consider Bush's Opposition, District Court did consider her tolling argument because FCPS raised it in its Motion for Summary Judgment; "[t]he fact that Plaintiff waited to exhaust her administrative remedies as to her Title VII claims does not affect the statute of limitations period for filing other claims." JA158.

The District Court properly dismissed the defamation claim because filing an EEOC Charge does not toll the statute of limitations on a separate legal claim outside of the EEOC's jurisdiction, even if both claims are based on the same underlying facts. *See Johnson v Railway Express Agency, Inc.*, 421 U.S. 454, 466 (1975) (acknowledging that, "failure to toll [during pendency of an EEOC administrative complaint] will have the effect of pressing a civil rights complainant who values his [independent] claim into court before the EEOC has completed its administrative proceeding.") In *Johnson*, the Supreme Court held that filing an EEOC Charge does not toll the statute of limitations on a 42 U.S.C. § 1981 discrimination claim based on the same facts as the Title VII claim before the EEOC. *Id*. *See also McNeal v. Montgomery County*, 307 F. App'x. 766, 771-72 (4th Cir. 2009) (rejecting plaintiff's argument that the statute of limitations on his state law claims should have been equitably tolled while his Title VII claim was pending before the EEOC).

In this case, Bush was obligated to file a defamation claim in court within the one-year statute of limitations because her EEOC Charge did not toll the statute of limitations.

## **CONCLUSION**

For the foregoing reasons, the District Court's Summary Judgment decision should be affirmed, and Bush's Appeal should be dismissed.

Respectfully submitted,

Dated: May 17, 2023

_____/s/_____

Donald E. English, Jr.
Tonecia R. Brothers-Sutton
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
(410) 415-2007 – Telephone
(410) 415-2001 – Facsimile
Donald.English@jacksonlewis.com
*Attorneys for Appellee Frederick County*
*Public Schools*

73

## **<u>RESPONSE TO REQUEST FOR ORAL ARGUMENT</u>**

Counsel respectfully requests oral argument in this matter.

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with type–volume limitations set forth in the Federal Rules of Appellate Procedure, the Local Rules of the Court of Appeals for the Fourth Circuit, and this Court's rulings (Dkt. 22; Dkt. 28).  This brief was prepared in Times New Roman font using 14-point type with the program Microsoft Word and contains 17,545 words.

_____/s/_____
Tonecia R. Brothers-Sutton

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of May 2023, the foregoing document was served on all parties through the CM/ECF system.

_____/s/_____
Tonecia R. Brothers-Sutton